**In the Interest of D.R.L.M.**

**No. 2–01–323–CV.**

Court of Appeals of Texas, Fort Worth.

July 3, 2002.

Rehearing Overruled Aug. 15, 2002.

Georganna L. Simpson, Dallas, Sondrea J. King, Fort Worth, for Appellants.

Tim Curry, Crim. D.A., Charles M. Mallin, Asst. Crim. D.A. and Chief of the Appellate Division, and Anne E. Swenson, David M. Curl, Clifford Bronson, and James C. Teel, Asst. Crim. D.A.s, Fort Worth, Kelly Swanda, and Dean Swanda, Arlington, for Appellees.

PANEL A: DAUPHINOT, GARDNER, and WALKER, JJ.

## OPINION

SUE WALKER, Justice.

### I. INTRODUCTION.

In this case, we decide two primary issues. We address the appropriate standard to be applied by the trial court in deciding whether to place half-sisters who have never lived together in the same adoptive home and whether the trial court's refusal to place a child with the persons named in a mother's voluntary affidavit of relinquishment affects the voluntariness of the affidavit. *See* TEX. FAM. CODE ANN. § 162.302(e) (Vernon Supp. 2002).[1]

The trial court terminated the parental rights of D.R.L.M.'s biological parents. Two families[2], the Smiths, who had previously adopted D.R.L.M.'s half-sister, and the Martins, who served as D.R.L.M.'s foster family, both intervened in the termination suit, seeking to adopt D.R.L.M. Both D.R.L.M.'s biological parents signed affidavits of voluntary relinquishment relinquishing her to the Smiths. Ultimately, however, the trial court ordered the Martins appointed managing conservators and adoptive parents of D.R.L.M.

We hold that under 162.302(e), placement of a child in the same adoptive home with her half-sister is one factor in an adoption proceeding supporting the child's adoption by the same persons who adopted the child's sibling.[3] We decline to hold, however, that section 162.302(e) requires the trial court to apply any heightened standard of proof. Instead, the positive opportunity to place a child in the same adoptive home with a half-sibling is simply one factor to be considered by the trial court in determining whether adoption is in the child's best interest. We also hold that the trial court's refusal to appoint as a child's managing conservators the persons designated by a parent in their affidavit of voluntary relinquishment does not automatically, or in this case, render the affidavit involuntary. We will modify the trial court's judgment and affirm it as modified.

### II. BACKGROUND FACTS.

In March 2000, a babysitter took D.R.L.M. to the hospital because the eight-month old had a very high fever. D.R.L.M. was diagnosed with bacterial spinal meningitis and was transported to Cooks Children's Medical Center for treatment. Hospital personnel contacted Texas Department of Protective and Regulatory Services ("TDPRS") when no one was available to consent to medical treatment on D.R.L.M.'s behalf. D.R.L.M.'s biological mother (hereinafter referred to by the fictitious name "Kristi") was in jail and D.R.L.M.'s biological father was "not around." TDPRS petitioned for emergency removal of D.R.L.M. so it could consent to treatment for the child. When D.R.L.M. was later released from the hospital on April 3, 2000, she was placed in foster care with the Martins.

---

1. All statutory references are to the Texas Family Code unless indicated otherwise.

2. To protect the privacy of the parties, we identify them by fictitious names. *See* TEX. FAM.CODE ANN. § 109.002(d) (Vernon 1996).

3. The family code defines "biological siblings" as persons who share a common birth

parent, so D.R.L.M. and her half-sister meet the statutory definition of siblings. *See* TEX FAM.CODE ANN. § 162.402(a) (Vernon Supp. 2002). This case, however, does not involve adoptive placement to "keep siblings together" under section 162.302(e) because D.R.L.M. and her half-sister have never resided in the same home.

TDPRS intended to reunify Kristi and D.R.L.M., but Kristi repeatedly failed to comply with the agency's service plan. In the meantime, TDPRS was examining options for D.R.L.M. and was attempting to contact known relatives of D.R.L.M. for her placement in the event Kristi proved unsuitable.

In September 2000, TDPRS discovered that the Smiths, who lived in Michigan, had adopted D.R.L.M.'s half-sister, A.C. D.R.L.M.'s half-sister's father is the Smiths' nephew. The Smiths agreed to consider placement of D.R.L.M. in their home. TDPRS sought and obtained an order for an expedited home study of the Smiths. Approximately one month after being contacted by TDPRS, the Smiths and A.C. traveled to Fort Worth to visit D.R.L.M. In December 2000, the Smiths filed their home study, which recommended a provisional foster home license. TDPRS filed a motion to appoint the Smiths as temporary possessory conservators of D.R.L.M.

Two days after TDPRS filed its motion to appoint the Smiths D.R.L.M.'s temporary possessory conservators, the Martins filed a petition in intervention seeking to be named managing conservators of D.R.L.M. Kristi and D.R.L.M.'s biological father both filed irrevocable affidavits of voluntary relinquishment relinquishing their parental rights to D.R.L.M. and designating the Smiths to serve as D.R.L.M.'s managing conservators.

D.R.L.M. stayed in the Martins' home from April 3, 2000, when she was approximately nine months old, through the time of trial, when she was approximately twenty-five months old. D.R.L.M. went on several extended trips to visit with the Smiths, including one trip for approximately eight weeks.

The issues of termination of the parental rights of Kristi and D.R.L.M.'s biological father and which family should be permitted to adopt D.R.L.M. proceeded to trial before the court. Following a two-day trial, the trial court terminated Kristi's and D.R.L.M.'s father's parental rights, and ordered the Martins appointed managing conservators of D.R.L.M. The trial court later timely made findings of fact and conclusions of law.

Specifically, the trial court found the parental rights of D.R.L.M.'s biological parents should be terminated because both parents had:

a. knowingly engaged in criminal conduct that has resulted in a conviction of an offense and confinement or imprisonment and inability to care for the child for not less than two years from the date the petition was filed; and,

b. executed an unrevoked or irrevocable affidavit or relinquishment of parental rights as provided by chapter 161 of the Texas Family Code.

The trial court also found that: D.R.L.M.'s biological parents designated the Smiths as their intended managing conservators for the child; the appointment of the Smiths as the managing conservators of D.R.L.M. was not in D.R.L.M.'s best interest; the appointment of the Martins as the managing conservators of D.R.L.M. was in D.R.L.M.'s best interest; and the adoption of D.R.L.M. by the Martins was in D.R.L.M.'s best interest.

Kristi and the Smiths appeal the trial court's order.[4] TDPRS asserts that termination of Kristi's rights was proper, but argues that the trial court erred by failing to "apply any kind of heightened standard to separating D.R.L.M. from her half-sister" and urges us to reverse the trial

---

4. D.R.L.M.'s biological father is not a party to this appeal.

court's judgment awarding managing conservatorship to the Martins and to render judgment awarding the Smiths managing conservatorship of D.R.L.M. The Martins assert that the trial court correctly terminated Kristi's rights, properly appointed them managing conservators of D.R.L.M., and properly ordered their adoption of D.R.L.M.

## III. KRISTI'S APPEAL.

The trial court terminated Kristi's parental rights on two grounds. First, the trial court found, pursuant to section 161.001(Q) of the family code, that Kristi knowingly engaged in criminal conduct that resulted in her conviction of an offense and confinement or imprisonment and inability to care for D.R.L.M. for not less than two years from the date the petition for termination was filed. Second, the trial court found Kristi had executed an "unrevoked or irrevocable affidavit of relinquishment of parental rights." Kristi raises six issues on appeal challenging these grounds for terminating her parental rights. TDPRS, however, argues Kristi's failure to timely file a "statement of points" as required by family code section 263.405(b) jurisdictionally bars appellate review of all six of her issues. *See* TEX. FAM.CODE ANN. § 263.405(b) (Vernon Supp. 2002). We will first address TDPRS's jurisdictional complaint.

## A. Is Compliance With Section 263.405(b) Jurisdictional?

■ Family code section 263.405 was amended by House Bill 2249, effective September 1, 2001, and applies to all appeals filed after September 1, 2001. TEX. FAM.CODE ANN. § 263.405(b). Section 263.405(b) now provides:

Not later than the 15th day after the date a final order is signed by the trial judge, a party intending to appeal the order must file with the trial court a statement of the point or points on which the party intends to appeal. The statement may be combined with a motion for a new trial.

*Id.*

TDPRS analogizes this section to rule of appellate procedure 34.6(c), requiring a statement of points when the appellant designates a partial record, and urges this court to require strict compliance with section 263.405(b) like we do with rule 34.6(c). *See* TEX.R.APP. P. 34.6(c); *e.g., CMM Grain Co. v. Ozgunduz*, 991 S.W.2d 437, 439 (Tex. App.-Fort Worth 1999, no pet.) (requiring strict compliance with rule 34.6(c)). TDPRS also points out that courts require strict compliance with family code section 263.401(a), the provision generally requiring a trial court to render a final termination order within a year of the filing of a petition by TDPRS seeking termination of the parent-child relationship or seeking to be named conservator of the child. *See* TEX. FAM.CODE ANN. § 263.401(a) (Vernon Supp.2002).

■ In involuntary termination cases, however, we are required to strictly construe the involuntary termination statutes *in favor of the parent. Holick v. Smith*, 685 S.W.2d 18, 20–21 (Tex.1985); *In re D.T.*, 34 S.W.3d 625, 629 (Tex.App.-Fort Worth 2000, pet. denied). Automatically equating rule 34.6(c) with section 263.401(a) would ignore the constitutional magnitude of the parental rights at stake here; these rights underlie the requirement that we strictly construe the involuntary termination statutes in favor of the parent. *Holick*, 685 S.W.2d at 20. Likewise, we strictly construe section 263.401(a)'s one-year time period *in favor of the parent* to require disposition, dismissal or an extension within the one-year statutory period. *See* TEX. FAM.CODE ANN. § 263.401(a). Here, TDPRS asks us to

construe section 263.405(b) *against the parent* and hold the parent's failure to timely file a statement of points jurisdictionally bars the parent's appeal. TDPRS's arguments do not compel the conclusion that a parent's failure to timely file section 263.405(b)'s statement of points deprives this court of jurisdiction.

The trial court signed the order of termination and the decree of adoption on September 20, 2001. On October 5, 2001, the court appointed attorney Sondrea King to handle Kristi's appeal. On October 6, 2001, King filed a "statement of points" on behalf of Kristi. The statement of points included three issues, two challenging the voluntariness of Kristi's affidavit of relinquishment relinquishing D.R.L.M. to the Smiths, and one challenging the legal and factual sufficiency of the evidence to support termination of Kristi's rights under section 161.001(1)(Q).[5] Moreover, the statement of points specifically stated, *"In filing this Statement, Respondent does*

*not waive the right to raise additional points on appeal that may become known after the record is filed."* The six issues raised by Kristi on appeal deal with either the factual and legal sufficiency of the evidence to support involuntary termination of her parental rights under section 161.001(1)(Q) or with challenges to the voluntariness of her affidavit of relinquishment relinquishing D.R.L.M. to the Smiths.[6]

◼ No case has construed section 263.405(b). In construing a statute, our ultimate purpose is to discover and give effect to the legislature's intent in enacting it. *In re Canales*, 52 S.W.3d 698, 702 (Tex.2001); *Meritor Auto., Inc. v. Ruan Leasing Co.*, 44 S.W.3d 86, 89 (Tex.2001). We may consider the object sought to be attained by the statute; the circumstances under which the statute was enacted; legislative history; common law or former statutory provisions; consequences of a

---

5. Kristi's statement of points provides:
 *Point One:* Respondent's Affidavit of Relinquishment of Parental Rights was executed involuntarily because it was specifically executed on the belief and condition that Respondent's biological child, [D.R.L.M.], would be placed for adoption with Intervenors Patrick and Sueanne [Smith].
 *Point Two:* Because Respondent's Affidavit of Relinquishment of Parental Rights was involuntary, termination of Respondent's parental rights on that ground is not supported by the evidence.
 *Point Three:* The evidence is legally and factually insufficient to support the trial court's finding that Respondent's parental rights should be terminated under Texas Family Code § 161.001[(1)](Q)(ii).

6. The six issues raised by Kristi on appeal are:
 A. Issue One: The evidence is legally and factually insufficient to support the trial court's finding that Respondent's parental rights should be terminated under Texas Family Code § 161.001[(1)](Q).
 B. Issue Two: Respondent's affidavit of relinquishment of parental rights was not voluntary because it was specifically execut-

ed on the belief and condition that Respondent's biological child, D.R.L.M., would be placed for adoption with interveners Patrick and Sueanne [Smith].
 C. Issue Three: Because Respondent's affidavit of relinquishment was not voluntary, the evidence is legally and factually insufficient to support termination of her parental rights under section 161.001(1)(K).
 D. Issue Four: The trial court may not accept an affidavit of relinquishment to terminate parental rights and not follow the affidavit's designation of managing conservatorship.
 E. Issue Five: Because Respondent's affidavit of relinquishment was not executed according to the terms of section 161.103, the evidence is legally and factually insufficient to support the trial court's finding that termination was proper under section 161.001(1)(K).
 F. Issue Six: The trial court abused its discretion in failing to designate the [Smiths] as D.R.L.M.'s managing conservators, as mandated by section 153.374(b).

particular construction; administrative construction of the statute; and the title (caption), preamble, and emergency provisions. Tex. Gov't Code Ann. § 311.023 (Vernon 1998); *Nat'l Liab. & Fire Ins. Co. v. Allen,* 15 S.W.3d 525, 527 (Tex.2000). We presume the legislature intended a just and reasonable result in enacting a statute. Tex. Gov't Code Ann. § 311.021(3) (Vernon 1998). We will not construe a statute in a manner that will lead to a foolish or absurd result when another alternative is available. *Del Indus., Inc. v. Tex. Workers' Comp. Ins. Fund,* 973 S.W.2d 743, 747–48 (Tex.App.-Austin 1998), *aff'd,* 35 S.W.3d 591 (Tex.2000).

 In determining legislative intent, we do not view the words, phrases, and individual clauses in isolation, but rather we must examine them within the context of the entire act. *Meritor,* 44 S.W.3d at 90. If possible, each sentence, phrase, clause, and word must be given effect, so that the statute makes sense as a cohesive whole. *Id.* We will not, however, assign a meaning to a term or provision that would be inconsistent with other provisions of the statute. *Id.; Steak & Ale of Tex., Inc. v. Borneman,* 62 S.W.3d 898, 905 (Tex.App.-Fort Worth 2001, no pet.).

We therefore examine the entire act, to view subsection (b)'s statement-of-points requirement in context. Although section 263.405(b) indicates that the statement of points "must" be filed, "not later than the 15th day after the date a final order is signed," it nonetheless provides that the statement may be combined with a motion for new trial. Tex. Fam.Code Ann. § 263.405(b) (Vernon Supp.2002). A motion for new trial is not due until the thirtieth day after the date a final order is signed. *See* Tex.R. Civ. P. 329b(a). Section 263.405(d) provides:

(d) The trial court shall hold a hearing not later than the 30th day after the date the final order is signed to determine whether:

(1) a new trial should be granted;

(2) a party's claim of indigence, if any, should be sustained; and

(3) the appeal is frivolous as provided by Section 13.003(b), Civil Practice and Remedies Code.

Tex. Fam.Code Ann. § 263.405(d). Subsections (f) and (h) provide, respectively, that the record is due within sixty days after the date the final order is signed and that the appellate court may not extend the time to file the record or to file briefs "except on a showing of good cause." *Id.* § 263.405(f), (h). We have also reviewed the legislative history behind this Act. The purpose of the Act was to address post-judgment appellate delays, correct provisional inconsistencies, and provide a mechanism through which a party or TDPRS can compel the trial court to timely set the case for final trial. House Comm. on Juvenile Justice and Family Issues, Bill Analysis, Tex. H.B. 2249, 77th Leg., R.S. (2001).

Reviewing the act as a whole, it is clear that the legislature intended the act to reduce post-judgment appellate delays, not to deprive an appellate court of jurisdiction. An appeal is perfected, and our jurisdiction is vested, by the filing of a notice of appeal. *See* Tex.R.App. P. 25.1(b) (*"The filing of a notice of appeal by any party invokes the appellate court's jurisdiction over all parties to the trial court's judgment or order appealed from."*) (emphasis added). Section 263.405 does not purport to alter either rule 25's notice of appeal requirement or its use of the notice of appeal as the vehicle that triggers appellate court jurisdiction. Here, King timely filed a notice of appeal on behalf of Kristi.

The supreme court has repeatedly recognized that a party's good faith effort to invoke an appellate court's jurisdiction by

filing a notice of appeal, even late, but within the fifteen-day time period allowed for extensions of time to file late notices of appeal, is effective to invoke the appellate court's jurisdiction. *See Jones v. City of Houston*, 976 S.W.2d 676, 677 (Tex.1998); *Verburgt v. Dorner*, 959 S.W.2d 615, 616 (Tex.1997). The supreme court explained:

> This Court has never wavered from the principle that appellate courts should not dismiss an appeal for a procedural defect whenever any arguable interpretation of the Rules of Appellate Procedure would preserve the appeal. We have repeatedly held that a court of appeals has jurisdiction over any appeal in which the appellant files an instrument in a bona fide attempt to invoke the appellate court's jurisdiction.

*Verburgt*, 959 S.W.2d at 616.

Thus, considering the object sought to be attained by the statute, the statute's legislative history, the consequences of the construction urged by TDPRS on appellate court jurisdiction, and viewing the act as a whole while strictly construing the statute in favor of parents, we hold that a litigant's failure to file a section 263.405(b) statement of points within fifteen days of the date a final order is signed by the trial court does not deprive this court of jurisdiction over an appeal from that order when an appellant timely files a notice of appeal. We hold that we possess jurisdiction over the issues raised by Kristi.

TDPRS also complains that Kristi has forfeited her issues on appeal because the points set forth in her statement of points are not the same as those she raises on appeal. As previously mentioned, the issues raised by Kristi on appeal deal with the same two complaints she raised in her statement of points: factual and legal sufficiency of the evidence and the voluntariness of her affidavit of relinquishment. Consequently, we hold that Kristi's issues

on appeal were properly raised in her statement of points.

## B. Legal and Factual Sufficiency of the Evidence to Support Section 161.001(1)(Q) Termination.

■ In her first issue, Kristi challenges the legal and factual sufficiency of the evidence to support the trial court's termination of her parental rights under family code section 161.001(1)(Q). *See* Tex. Fam. Code Ann. § 161.001(1)(Q) (Vernon Supp. 2002). Termination of parental rights is a drastic remedy and is of such weight and gravity that due process requires the petitioner to justify termination by "clear and convincing evidence." *Id.* § 161.206(a) (Vernon 1996); *In re A.R.R.*, 61 S.W.3d 691, 697 (Tex.App.-Fort Worth 2001, pet. denied). This standard is defined as the "measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." Tex. Fam.Code Ann. § 101.007; *In re A.R.R.*, 61 S.W.3d at 697 (citing *Transp. Ins. Co. v. Moriel*, 879 S.W.2d 10, 31 (Tex.1994)). This intermediate standard falls between the preponderance standard of ordinary civil proceedings and the reasonable doubt standard of criminal proceedings. *In re A.R.R.*, 61 S.W.3d at 697.

■ When an appellant challenges the legal sufficiency of the evidence on an issue on which he did not have the burden of proof, the appellant must demonstrate there is no evidence to support the adverse finding. *Croucher v. Croucher*, 660 S.W.2d 55, 58 (Tex.1983). In reviewing a no evidence challenge, we consider only the evidence and inferences tending to support the adverse finding and disregard all contrary evidence and inferences. *Bradford v. Vento*, 48 S.W.3d 749, 754 (Tex.2001); *Cont'l Coffee Prods. Co. v. Cazarez*, 937 S.W.2d 444, 450 (Tex.1996); *In re B.B.*,

971 S.W.2d 160, 164 (Tex.App.-Beaumont 1998, pet. denied). Anything more than a scintilla of evidence is legally sufficient to support the finding. *Cazarez*, 937 S.W.2d at 450. That is, if more than a scintilla of evidence supports the trial court's findings, the appealing parent cannot prevail on a legal sufficiency point. *In re R.D.*, 955 S.W.2d 364, 368 (Tex.App.-San Antonio 1997, pet. denied).

▆▆▆▆ Review of factual sufficiency of the evidence under a clear and convincing standard requires us to determine whether the evidence is sufficient to make the existence of the facts highly probable, not whether the evidence supporting the finding is sufficient to make the existence of the facts more probable than not, as in ordinary civil cases. *In re A.R.R.*, 61 S.W.3d at 697; *In re D.T.*, 34 S.W.3d 625, 632 (Tex.App.-Fort Worth 2000, pet. denied) (op. on reh'g). That is, we must consider whether the evidence is sufficient to produce in the mind of the fact finder a firm belief or conviction as to the truth of the allegation sought to be established. *In re D.T.*, 34 S.W.3d at 632; *Faram v. Gervitz-Faram*, 895 S.W.2d 839, 843 (Tex. App.-Fort Worth 1995, no writ). We are required to consider all of the evidence in the case in making this determination. *In re A.R.R.*, 61 S.W.3d at 697 (citing *Mar. Overseas Corp. v. Ellis*, 971 S.W.2d 402, 406 (Tex.), *cert. denied*, 525 U.S. 1017, 119 S.Ct. 541, 142 L.Ed.2d 450 (1998)).

The trial court determined termination of Kristi's parental rights was proper based on family code section 161.001(1)(Q). That section provides:

> The court may order termination of the parent-child relationship if the court finds by clear and convincing evidence:
>
> (1) that the parent has:
>
> . . . .

> (Q) knowingly engaged in criminal conduct that has resulted in the parent's:
>
> (i) conviction of an offense; and
>
> (ii) confinement or imprisonment and inability to care for the child for not less than two years from the date of filing of the petition;

TEX. FAM.CODE ANN. § 161.001(1)(Q)(Vernon Supp.2002).

Kristi argues subsection Q requires TDPRS to prove that she has been confined for two years since the date on which TDPRS filed the termination petition. TDPRS concedes "the trial court's termination order probably cannot be upheld on the Section 161.001(1)(Q) theory" and acknowledges Kristi was not incarcerated for two years either before or after the termination petition was filed. The Martins, on the other hand, contend subsection Q requires only proof that (1) the parent has been convicted of an offense, (2) the parent was confined or imprisoned, and (3) the parent is not able to care for the child for not less than two years from the date of filing of the petition, but the inability to care for the child does not necessarily have to be because the parent is confined or imprisoned.

In support of their construction of subsection Q, the Martins rely on family code section 263.401, which generally requires a court to render a final termination order within one year after appointing TDPRS temporary managing conservator of a child or otherwise to dismiss the suit. *See* TEX. FAM.CODE ANN. § 263.401(a). The Martins reason that section 161.001(1)(Q) cannot be construed as requiring a parent's imprisonment for two years after the filing of the termination petition because termination suits filed by TDPRS in which it is appointed temporary managing conservator will be dismissed under section 263.401(a)'s

one-year time period before a parent has been imprisoned for two years.

We will first review pertinent case law. The few cases discussing termination under section 161.001(1)(Q) have interpreted that subsection's requirements slightly differently. *See In re A.R.R.*, 61 S.W.3d at 700; *In re I.V.*, 61 S.W.3d 789, 798 (Tex. App.-Corpus Christi, 2001, no pet.); *In re Caballero*, 53 S.W.3d 391, 395–96 (Tex. App.-Amarillo 2001, pet. denied); *In re D.T.*, 34 S.W.3d at 638.

In *In re A.R.R.*, appellant was imprisoned in 1996, and although he was eligible for parole, he asked "to remain in prison for the full term, which will end in 2005." 61 S.W.3d at 694. TDPRS filed suit to terminate appellant's parental rights in October 1999, and TDPRS was appointed sole temporary managing conservator of A.R.R. *Id.* Following the final hearing, the trial court terminated appellant's parental rights based on several of the statutory involuntary termination grounds, including section 161.001(1)(Q). We explained:

> Appellant maintained that when he became eligible for parole, he wrote the parole board and requested that he be allowed to remain in prison until his release date in 2005, even though there is "no chance" that he will see A.R.R. until she is twenty years old if he stays in prison that long. *It is clear that Appellant's voluntary actions imprisoned him **and cause him to remain imprisoned still**, and that the same actions **rendered him unable to provide***

***any sort of financial, emotional, or physical care for his daughter.***

*Id.* at 701 (emphasis added). Accordingly, we held that the evidence was factually and legally sufficient to support termination of appellant's rights under section 161.001(1)(Q).[7]

In *In re I.V.*, the Corpus Christi Court of Appeals interpreted subsection Q to mean that "a person's parental rights may be terminated if the person knowingly engages in criminal conduct that results in his imprisonment and he is unable to care for the child for at least two years from the date the termination petition is filed." 61 S.W.3d at 798. The termination petition was filed on April 8, 1999, and TDPRS proved appellant would still be incarcerated in federal prison pursuant to a forty-year sentence on April 8, 2001. *Id.* Because the record also contained evidence appellant was unable to care for I.V., the court affirmed termination on the basis of subsection Q.

In *In re Caballero*, the appellant's probation was revoked as a result of a May 1998 DWI conviction, and he was sentenced to eight years' confinement. 53 S.W.3d at 394. TDPRS filed its termination petition in September 1998. *Id.* In addressing the sufficiency of the evidence to support the termination of appellant's rights under section 161.001(1)(Q), the Amarillo Court of Appeals interpreted subsection Q as requiring proof of appellant's conviction, proof of appellant's incarceration, and proof of appellant's inability to care for the child for at least two years

7. TDPRS points out that language used by this court in *In re A.R.R.* purportedly requires subsection Q's "inability to care" requirement to run "for at least two years *prior to* the date on which the petition was filed" rather than *from* the date the petition was filed as required by the statute. *A.R.R.*, 61 S.W.3d at 700 (emphasis added). Our opinion makes it clear, however, that we considered the appel- lant's imprisonment from 1999, when the termination petition was filed, through 2005, the date appellant was scheduled for release from prison, because he petitioned to be denied parole. *Id.* Consequently, the opinion reflects that we did consider evidence of appellant's inability to care for his daughter for two years after the filing of the petition. *Id.*

from the date of the filing of the petition for termination. *Id.* at 395. "Care," the court explained, is not limited to parental care. *Id.* at 395–96. Instead, "[b]ecause incarceration is inherently inconsistent with providing personal care for a child, the legislature's inclusion of the phrase 'and inability to care for the child' would be meaningless unless care encompassed arranging for care to be provided by another." *Id.* at 396. Consequently, the Amarillo Court held that once TDPRS proves "a parent's knowing criminal conduct resulting in their *incarceration for more than two years,* the parent must produce some evidence as to how they would provide or arrange to provide care for the child during that period." *Id.* (emphasis added).

In *In re D.T.,* this court indicated that subsection Q provided for termination based on knowing commission of a criminal offense resulting in *confinement for two years or more* from the date the termination petition was filed. 34 S.W.3d at 638.

Hence, in summary, three of the four cases discussing subsection Q construed it as requiring two years' confinement. *In re I.V.,* 61 S.W.3d at 798; *In re Caballero,* 53 S.W.3d at 396; *In re D.T.,* 34 S.W.3d at 638. One case, *In re A.R.R.,* seems to indicate two years' confinement is not required, but nonetheless, the facts in that case clearly demonstrated the appellant was confined and would remain confined for two years from the date of the filing of the petition. *In re A.R.R.,* 61 S.W.3d at 700–01.

Looking to the statutory language itself, we note that the legislature drafted a two-pronged test. A parent's rights may be terminated when the court finds by clear and convincing evidence that a parent knowingly engaged in criminal conduct that has resulted in the parent's: (i) conviction of an offense; and (ii) confinement or imprisonment and inability to care for the child for not less than two years from the date of filing of the petition. TEX. FAM.CODE ANN. § 161.001(1)(Q). If the Legislature did not intend to make two years' imprisonment a requirement of subsection Q, the construction urged by the Martins, it could easily have just made the last part of the test's second prong a third prong, i.e.: (ii) confinement or imprisonment; and (iii) inability to care for the child for not less than two years from the date of filing of the petition. We therefore conclude that the legislature intended for the not-less-than-two-years language to modify both the parent's confinement or imprisonment and the parent's inability to care for the child.

This construction of subsection Q is also supported by the fact that, traditionally, incarceration standing alone will not support termination of parental rights. *See In re Caballero,* 53 S.W.3d at 395–96; *see also, e.g., Tex. Dep't. of Human Servs. v. Boyd,* 727 S.W.2d 531, 533 (Tex.1987) (holding incarceration alone does not constitute engaging in conduct which endangers the emotional or physical well-being of a child); *In re D.T.,* 34 S.W.3d at 633 (recognizing, "[I]t has long been settled that imprisonment, standing alone, does not constitute abandonment of a child" for purposes of termination of parental rights). Otherwise, the termination of parental rights could become an additional punishment automatically imposed along with imprisonment for almost any crime. *In re D.T.,* 34 S.W.3d at 636.

Thus, in light of the foregoing case law, as well as the requirement that we strictly construe termination statutes in favor of the parents, we will not construe subsection Q, as urged by the Martins, as requiring only a conviction resulting in confinement or imprisonment, even for only one

day, coupled with a two-year inability to care for the child. *See Holick*, 685 S.W.2d at 20–21 (we are required to strictly construe the involuntary termination statutes in favor of the parent); *Del Indus., Inc.*, 973 S.W.2d at 747–48 (recognizing that we will not construe a statute in a manner leading to a foolish or absurd result when another alternative is available). We hold termination under subsection Q is authorized only upon proof that the parent has knowingly engaged in criminal conduct that has resulted in the parent's conviction and confinement for at least two years from the date of the filing of the petition and in the parent's inability to care for the child for not less than two years. The record before us conclusively establishes Kristi was not confined for two years from the date of the filing of the petition. Thus, the evidence is legally insufficient to support the trial court's termination of Kristi's parental rights based on subsection Q. We sustain Kristi's first issue.

**C. Voluntariness of Affidavit of Relinquishment; Sufficiency of the Evidence to Support Termination Under Section 161.001(1)(K).**

In her second through sixth issues, Kristi complains that: (1) her affidavit of relinquishment was not voluntarily executed because she voluntarily relinquished her parental rights only to the Smiths, not to the Martins; (2) because her affidavit was involuntary, the evidence is legally and factually insufficient to support termination of her parental rights under section 161.001(1)(K); (3) the trial court has no discretion to accept an affidavit of voluntary relinquishment and then not abide by the choice of managing conservatorship designated in the affidavit; (4) her affidavit of relinquishment was not executed in compliance with section 161.103; and (5) the trial court abused its discretion in refusing to designate the Smiths D.R.L.M.'s

managing conservators under section 153.374(b).

We will first address Kristi's fifth issue, in which she asserts that her affidavit of voluntary relinquishment was not executed in compliance with family code section 161.103. *See* Tex. Fam.Code Ann. § 161.103 (Vernon Supp.2002) (setting forth the statutory requirements for voluntary affidavits of relinquishment). Specifically, Kristi contends her affidavit was signed only by one witness, not two as required by the statute. *See id.* § 161.103(a)(2). TDPRS points out, however, Kristi asked the court to "accept her Affidavit of Relinquishment and place [D.R.L.M.] in the custody of the Smiths." TDPRS contends the invited error doctrine precludes Kristi from urging the trial court to accept her affidavit and then challenging the formalities of that same affidavit on appeal. Because we hold that Kristi's affidavit met the requisites of section 161.103(a)(2), we do not address TDPRS's invited error argument.

Section 161.103(a)(2) provides, "An affidavit for voluntary relinquishment of parental rights must be ... witnessed by two credible persons." *Id.* Page four of Kristi's affidavit of voluntary relinquishment contains the caption "WITNESSES AT REQUEST OF AFFIANT [TWO REQUIRED BY LAW]." Below this caption are blanks for the two witnesses to fill in their name, address, city, state, and zip code, along with another blank for each witnesses' signature. On Kristi's affidavit, two witnesses filled in the blanks with their address, city, state, and zip code. One witness printed her name in the blank titled "name" and signed her name on the signature line. The other witness, however, simply signed her name in the blank titled "name" and left the signature line blank. It is this blank signature line for

the second witness that Kristi contends renders her affidavit statutorily defective. We cannot agree. Kristi's affidavit *was* witnessed by two witnesses. One witness simply placed her signature on the name line rather than on the signature line. We hold that Kristi's affidavit did comply with section 161.103(a)(2)'s requirement that an affidavit of voluntary relinquishment be "witnessed by two credible persons." We overrule Kristi's fifth issue.

■ In her second issue, Kristi argues that her affidavit of relinquishment was not voluntary because she relinquished D.R.L.M. only to the Smiths, and the trial court did not appoint the Smiths D.R.L.M.'s managing conservators. TDPRS asserts that Kristi forfeited her second and third issues, challenging the voluntariness of her affidavit of relinquishment, because she did not plead or prove involuntariness in the trial court. TDPRS also argues that pursuant to family code section 161.211(c) an affidavit of relinquishment is not challengeable on the ground the trial court did not appoint the managing conservator designated in the affidavit. *See* Tex. Fam.Code Ann. § 161.211(c). Therefore, TDPRS contends we lack jurisdiction over Kristi's second issue.

■ Under the Texas Family Code, the trial court may terminate parental rights upon a finding, by clear and convincing evidence, that the parent has "executed before or after the suit is filed an unrevoked or irrevocable affidavit of relinquishment of parental rights as provided by this chapter," and that termination is in the best interest of the child. *Id.* § 161.001(1)(K), (2) (Vernon Supp.2002); *In re V.R.W.*, 41 S.W.3d 183, 190 (Tex. App.-Houston [14th Dist.] 2001, no pet.). Implicit in the family code is the requirement that the affidavit of *voluntary* relinquishment be voluntarily executed. *In re V.R.W.*, 41 S.W.3d at 192; *Neal v. Tex.*

*Dep't. of Human Servs.*, 814 S.W.2d 216, 218–19 (Tex.App.-San Antonio 1991, writ denied). An involuntarily executed affidavit is a complete defense to a termination suit or decree based solely upon a finding under section 161.001(1)(K). *Vela v. Marywood*, 17 S.W.3d 750, 759 (Tex.App.-Austin 2000, pet. denied).

■ The proponent of the voluntary affidavit of relinquishment has the burden to establish by clear and convincing evidence that the affidavit was executed according to the terms of section 161.103 of the family code. *In re V.R.W.*, 41 S.W.3d at 190; *Vela*, 17 S.W.3d at 758. Evidence that an affidavit of voluntary relinquishment was signed, notarized, witnessed, and executed in compliance with family code section 161.103 is prima facie evidence of its validity. *In re V.R.W.*, 41 S.W.3d at 190; *In re B.B.F.*, 595 S.W.2d 873, 875 (Tex.Civ.App.-San Antonio 1980, no writ). Once the proponent of the affidavit has met this burden, the affidavit may be set aside only upon proof, by a preponderance of the evidence, that the affidavit was executed as a result of fraud, duress, or coercion. *See* Tex. Fam.Code Ann. § 161.211(c) (Vernon Supp.2002) ("[a] direct ... attack on an order terminating parental rights based on an unrevoked affidavit of relinquishment of parental rights ... is limited to issues relating to fraud, duress, or coercion in the execution of the affidavit"); *see also Queen v. Goeddertz*, 48 S.W.3d 928, 929–32 (Tex.App.-Beaumont 2001, no pet.); *Vela*, 17 S.W.3d at 758.

■ In determining whether fraud existed in the execution of the affidavit, courts look to the circumstances surrounding its execution. *Vela*, 17 S.W.3d at 762. For example, in *Queen v. Goeddertz*, the court of appeals held an affidavit of relinquishment involuntary when it contained a paragraph stating the father relinquished

his rights "subject to the understanding that I will have reasonable visitation rights with my child." 48 S.W.3d at 929. In *Vela v. Marywood*, the court of appeals held an affidavit involuntary when the evidence conclusively established that the mother wanted to proceed with the adoption only if she could have post-adoption visits with her child. 17 S.W.3d at 762. The *Vela* court noted that although the mother testified she was not threatened, coerced, or defrauded into physically signing the affidavit of relinquishment, nonetheless, she did not know the post-adoption plan she initiated with the adoption agency and the adoptive family was legally unenforceable. *Id.* at 753–54.

Therefore, we disagree with TDPRS's contention that Kristi is jurisdictionally barred from challenging the voluntariness of her relinquishment affidavit on the ground she believed that the trial court was required to relinquish D.R.L.M. to the family she and D.R.L.M.'s biological father designated. We recognize that family code section 161.211(c) limits an attack on an order terminating parental rights based on an unrevoked affidavit of relinquishment of parental rights to issues *relating to* fraud, duress, or coercion in the execution of the affidavit. *See* TEX. FAM.CODE ANN. § 161.211(c). We perceive Kristi's challenge, however, as falling squarely within the statutorily authorized challenges, *relating to* fraud, duress, or coercion, just as Vela's and Queen's challenges did. *See Vela*, 17 S.W.3d at 760 (discussing "fraud" as any cunning or artifice used to cheat or deceive another). That is, whether, given all of the circumstances surrounding the execution of Kristi's affidavit of relinquishment, the affidavit was procured by fraud or some issue relating to fraud, because of Kristi's alleged belief that the trial court was required to place D.R.L.M. with the family she designated in her affidavit of relinquishment.

We next address TDPRS's contention that Kristi waived her second issue on appeal by failing to plead it in the trial court. Kristi could not have pleaded in the trial court the involuntariness of her affidavit on the ground that she believed the trial court was required to abide by her choice of managing conservators because she allegedly possessed this belief up until the trial court actually declined to appoint the Smiths as D.R.L.M.'s managing conservators and instead appointed the Martins. Consequently, we hold that under the present facts, Kristi's failure to plead involuntariness does not waive her right to challenge on appeal the voluntariness of her affidavit.

We have overruled Kristi's only challenge to her affidavit's alleged noncompliance with section 161.103. Therefore, Kristi's affidavit, signed, notarized, witnessed, and executed in compliance with family code section 161.103, is prima facie evidence of its validity. *See In re V.R.W.*, 41 S.W.3d at 190. Kristi bore the burden of establishing by a preponderance of the evidence that her affidavit of relinquishment was not voluntarily executed because of some issue relating to fraud, duress, or coercion in the execution of the affidavit. *See* TEX. FAM.CODE ANN. § 161.211(c); *In re V.R.W.*, 41 S.W.3d at 193. After hearing the evidence, however, the trial court found Kristi "executed an unrevoked or irrevocable affidavit of relinquishment of parental rights as provided by chapter 161 of the Texas Family Code." In making this finding, the trial court necessarily determined Kristi's affidavit was voluntarily executed. *See, e.g., In re V.R.W.*, 41 S.W.3d at 192 (recognizing that "implicit in the family code is the requirement that the affidavit of voluntary relinquishment be voluntarily executed"). We interpret Kristi's appellate attack on the voluntari-

ness of her affidavit as a challenge to the legal sufficiency of the evidence to support the trial court's presumed voluntariness finding. *See* Tex.R. Civ. P. 299 (omitted elements are presumed in support of judgment). Because Kristi bore the burden of proof to establish involuntariness, we review the record before us, applying the traditional legal sufficiency standard of review to determine whether the evidence conclusively established the existence of issues relating to fraud, duress, or coercion in the execution of Kristi's affidavit.

In reviewing the legal sufficiency of the evidence supporting the voluntariness of Kristi's affidavit, we first examine the record for evidence that supports the implied voluntariness finding while ignoring all evidence to the contrary. *See Vela,* 17 S.W.3d at 759. Next, if there is no evidence to support the finding, then we examine the entire record to see if the involuntariness of Kristi's affidavit was established as a matter of law. *See id.*

Kristi's affidavit provides, "I fully understand that the termination suit may or may not be combined with a suit to adopt my child. I understand either way, once the Court terminates my parental rights, I *have no further say concerning my child, whether or not my child is adopted then or at some later time.*" [Emphasis added.] The record also reflects the following questions to and answers by Kristi at trial:

Q. Okay. Now, did you understand when you signed that Affidavit of Relinquishment that you were by that document giving up your rights as a parent to this child? Did you understand that?

A. Yes, I did.

Q. Is that your position here today in this trial that you want to persist with that position?

A. Yes, it is.

Q. Do you understand that by the judge accepting that, that that will become a final decision by this court, one that you cannot undo? Did you understand that?

A. Yes, I do.

. . . .

Q. Okay. Do you understand that if the Court grants your request and terminates your rights and names the [Smiths] as the managing conservator, you understand that they intend to adopt your child? Do you understand that?

A. Yes, I do.

Q. And do you understand that if that were to happen, *whether or not they adopt or not, when your rights are terminated, that's it for you, legally speaking?*

A. I understand that.

After discussing her decision that D.R.L.M. should go live with the Smiths, Kristi testified:

Q. But again, let me just make sure I understood your answer. So if this move was harmful to D.R.L.M., it wouldn't matter; you would still want her to move?

A. It would matter, but I've made my decision and I'm not going to go back on it.

Q. Why should your decision rule? Let me ask you that.

A. *My decision don't rule. It's the judge's decision that rules.*

Kristi was represented by counsel when she executed her affidavit of voluntary relinquishment, and the affidavit indicates she "obtained the advise [sic] of my attorney" in connection with executing the affidavit. This evidence, pointed out by TDPRS and the Martins in support of the trial court's implied voluntariness finding, constitutes some evidence Kristi voluntari-

ly executed her affidavit; that is, in this context, some evidence she understood at the time she executed the affidavit that both the Martins and the Smiths were attempting to adopt D.R.L.M. Although Kristi designated the Smiths as D.R.L.M.'s managing conservators and wanted D.R.L.M. to be adopted by them, this evidence shows she understood that the judge's decision as to whether D.R.L.M. would be adopted by the Smiths or the Martins "ruled."

We conclude the evidence is legally sufficient to support the trial court's implied finding that Kristi's affidavit of relinquishment was voluntarily executed. Nonetheless, we look to the evidence pointed to by Kristi as conclusively establishing the involuntariness of her affidavit. Kristi focuses on the following paragraphs of her affidavit:

It is in the best interest of [D.R.L.M.] that [D.R.L.M.] *be placed for adoption in the home of Patrick and Sueanne [Smith]. I therefore designate Patrick and Sueanne [Smith] as managing conservator of the child.* I have been informed of my parental rights, privileges, powers, and duties. I freely, voluntarily, and permanently give and relinquish to the above named persons all of my parental rights, privileges, powers, and duties.

. . . .

I know that I have the right to appear personally before the Court … to testify about my desires with respect to my child. Instead, *I want Patrick and Sueanne [Smith] to present this Affidavit of Relinquishment of Parental Rights to the Court and tell the Judge this affidavit speaks for me.*

. . . .

I have carefully considered alternative plans for my child's future and have obtained the advise [sic] of my attorney and whatever family members, friends, or other persons and professionals I feel were necessary to help me make this decision. This decision is very difficult for me to make, and under other circumstances I might have made a different decision. Nevertheless, under the circumstances I find myself in, I have decided that I cannot provide properly for my child's physical and emotional needs, and *I want Patrick and Sueanne [Smith] to be the permanent home for my child and for my child to be adopted by Patrick and Sueanne [Smith]. As I sign this Affidavit of Relinquishment of Parental Rights, I know that Patrick and Sueanne [Smith], in accepting my child for adoptive placement and assuming responsibility for my child, [are] relying on my promise that I will not attempt to reclaim my child.* With this in mind, I declare that I fully understand the meaning of this affidavit of relinquishment and the finality of my action in signing it, and, understanding all this, I am signing this freely, voluntarily, and with the firm conviction that this decision is the best available alternative for my child. [Emphasis added.]

Kristi claims that the language italicized above conclusively proves that she only intended to voluntarily relinquish D.R.L.M. to the Smiths and that her affidavit was involuntary to the extent it permitted someone other than the Smiths to be appointed managing conservator of D.R.L.M. Neither Kristi's affidavit nor the record of the termination hearing, however, establishes that Kristi conditioned termination of her parental rights on the unenforceable condition that the Smiths be permitted to adopt D.R.L.M. *Cf. Queen,* 48 S.W.3d at 930–32 (holding evidence conclusively established affidavit of relinquishment involuntary where it stated relinquishment was "subject to the under-

standing that I will have reasonable visitation with my child"); *Vela*, 17 S.W.3d at 762–63 (holding evidence conclusively established affidavit of relinquishment involuntary where it was based on adoption agency's "empty promise" of mother's post-adoption visits with child). To the contrary, Kristi's affidavit and her testimony show she wanted the Smiths to be appointed D.R.L.M.'s managing conservators, but understood her parental rights would be terminated regardless of which family was appointed as D.R.L.M.'s managing conservators. We overrule Kristi's second issue.

■ Kristi's third issue is intertwined with and conditioned upon her second issue. In her third issue, Kristi argues that because her affidavit of relinquishment was involuntary, the evidence is legally and factually insufficient to support the trial court's termination of her parental rights under family code section 161.001(1)(K) based on the affidavit. Because we have resolved Kristi's voluntariness challenge to her affidavit against her, and she states no other challenge to the termination of her rights based on the relinquishment affidavit, we overrule her third issue.

■ In her fourth issue, Kristi contends that the trial court "may not accept an affidavit of relinquishment to terminate parental rights and not follow the affidavit's designation of managing conservatorship." TDPRS argues that Kristi has waived this issue through inadequate briefing by failing to cite authority. Kristi acknowledges in her brief, however, that "[a]fter a thorough search of Texas law, counsel has found no cases that are directly on point for the issues at hand." More-

over, we are required to liberally construe the briefing rules. *See* Tex.R.App. P. 38.9. We hold Kristi's fourth issue is not waived due to inadequate briefing.

Turning to the merits of Kristi's fourth issue, we cannot agree with her position. Family code section 161.001(1)(K) authorizes a trial court to terminate a parent-child relationship if the court finds by clear and convincing evidence that the parent has executed an unrevoked affidavit of relinquishment of parental rights and that termination is in the best interest of the child. Tex. Fam.Code Ann. § 161.001(1)(K), (2). The statute nowhere requires the trial court to abide by the parent's choice of a managing conservator expressed in the relinquishment affidavit.[8] The primary problem with the construction of subsection K urged by Kristi is that it makes the parent's desires concerning the child's managing conservatorship more important than the trial court's determination of the best interest of the child. The trial court is required to appoint the person designated in an affidavit of relinquishment as the child's managing conservator unless the court finds the appointment would not be in the best interest of the child. *Id.* § 153.374 (Vernon 1996). Because Kristi's construction of subsection K would force the trial court to abide by a parent's designation of a managing conservator regardless of whether appointment of the named managing conservator was not in the best interest of the child, it is untenable. We overrule Kristi's fourth issue.

■ Kristi's sixth issue contends the trial court abused its discretion in failing to designate the Smiths as D.R.L.M.'s managing conservators, as mandated by

---

**8.** An affidavit of voluntary relinquishment must contain "the designation of a prospective adoptive parent ... to serve as managing conservator of the child." Tex. Fam.Code Ann. § 161.103(b)(12).

section 153.374(b),[9] and "adopts and joins the Smiths' Brief on Appeal on this issue." Kristi provides no further argument or authorities in support of her sixth issue. The Smiths do not, however, challenge the trial court's refusal to appoint them D.R.L.M.'s managing conservators under section 153.374(b). Rather, the Smiths argue the trial court erred by failing to adhere to family code section 162.302(e), which requires TDPRS, in providing adoption services, to "keep siblings together and whenever possible place siblings in the same adoptive home." *See* Tex. Fam.Code Ann. § 162.302(e) (Vernon Supp.2002). Because Kristi's sixth issue is not the same issue raised by the Smiths, we overrule it.

## IV. The Smiths' Appeal.

In two issues on appeal, the Smiths complain the trial court erred by failing to follow family code section 162.302(e)'s mandate to "whenever possible place siblings in the same adoptive home," and by refusing to appoint them D.R.L.M.'s managing conservators. *See id.* The Smiths point out that D.R.L.M.'s biological parents' affidavits of voluntary relinquishment name them as D.R.L.M.'s managing conservators and that TDPRS recommended placement of D.R.L.M. with them. Because the Smiths' two issues are related, we discuss them jointly.

As previously mentioned, TDPRS claims that Kristi's rights were properly terminated, but agrees with the Smiths that the trial court erred in refusing to appoint them managing conservators of D.R.L.M. TDPRS asks us to reverse the portion of the trial court's judgment ordering the Martins D.R.L.M.'s managing conservators and to render judgment awarding

managing conservatorship of D.R.L.M. to the Smiths.

We must first determine the appropriate standard of review to be applied to the Smiths' first issue. The Smiths frame their issue as a challenge to the sufficiency of the evidence, contending the evidence is legally and factually insufficient to support the trial court's "decision to split the siblings between two homes." TDPRS, however, argues the "standard of review of the adoption order is whether the trial court abused its discretion." In support of its contention, TDPRS cites *In re Doe 2*, 19 S.W.3d 278, 281 (Tex.2000).

In order to grant an adoption, the trial court must determine that adoption is in the best interest of the child. *See* Tex. Fam.Code Ann. § 162.016(a), (b) (Vernon 1996) (both requiring an adoption-is-in-the-child's-best-interest determination). The Texas Supreme Court in *In re Doe 2* recognized that we review a trial court's best interest finding in an adoption case for an abuse of discretion. 19 S.W.3d at 281. When we review trial court action under the abuse of discretion standard, however, the legal and factual sufficiency of the evidence supporting the trial court's action are relevant factors in determining whether an abuse of discretion occurred. *Beaumont Bank v. Buller*, 806 S.W.2d 223, 226 (Tex.1991); *Tex. Dep't of Health v. Buckner*, 950 S.W.2d 216, 218 (Tex.App.-Fort Worth 1997, no pet.). Thus, we review the trial court's determination that D.R.L.M.'s adoption by the Martins was in her best interest under an abuse of discretion standard, while considering the legal and factual sufficiency of the evidence supporting the trial court's best interest determination in our abuse of discretion analysis.

---

**9.** As mentioned above, section 153.374(b) requires the trial court to appoint the person a parent designates as managing conservator in an affidavit of relinquishment unless the court finds that the appointment would not be in the best interest of the child. Tex. Fam.Code Ann. § 153.374(b).

■ The Smiths and TDPRS argue, however, that family code section 162.302(e) required the *trial court* to impose some heightened burden of proof upon the Martins to justify not placing A.C. and D.R.L.M. in the same adoptive home. According to the Smiths and TDPRS, the Martins failed to establish clear and compelling reasons justifying placement of D.R.L.M. in a different adoptive home than A.C.

Section 162.032 is entitled "Adoption Assistance Program," and was added effective June 13, 2001. *See* Act of June 13, 2001, 77th Leg. R.S., ch 744, § 1, 2001 Tex. Gen. Laws 1467, 1468. It provides:

> (e) It is the intent of the legislature that the department in providing adoption services, *when it is in the children's best interest,* keep siblings together and whenever possible place siblings in the same adoptive home.

TEX. FAM.CODE ANN. § 162.302(e) (Vernon Supp.2002) (emphasis added). As previously noted, the family code defines "biological siblings" as persons who share a common birth parent, so D.R.L.M. and A.C. meet the statutory definition of siblings. *See* TEX. FAM.CODE ANN. § 162.402(9).

TDPRS cites several out-of-state cases for the proposition that section 162.302(e) required the trial court to place some type of heightened standard of proof upon the Martins to justify separation of D.R.L.M. from A.C. *See John B. v. Niagara Co. Dep't. Social Servs.,* 289 A.D.2d 1090, 735 N.Y.S.2d 333, 335–36 (N.Y.App.Div.2001); *In re C.J.R.,* 782 A.2d 568, 573 (Pa.Super.2001); *In re Stroh,* 240 Ga.App. 835, 523 S.E.2d 887, 894 (1999); *Fuerstenberg v. Fuerstenberg,* 591 N.W.2d 798, 809 (S.D. 1999); *In re Marriage of Orte,* 389 N.W.2d 373, 374 (Iowa 1986). We have reviewed these cases, and they hold that, in permitting an adoption, the trial court must act in the best interest of the child and place the child with a sibling *if it is in the child's best interest.* These cases do not seem to support imposition of a heightened standard to justify placing siblings who have never lived together in separate adoptive homes.

For example, *In re C.J.R.* involved facts similar to the present facts. *See* 782 A.2d at 573. C.J.R., a little girl approximately three years old at the time of trial, was placed with foster parents when she was six months old. *Id.* at 569. C.J.R.'s half-sister, approximately four years older than C.J.R., lived with her maternal grandparents in Indiana. *Id.* The mother sought placement of C.J.R. with her parents and C.J.R.'s half-sister. *Id.* at 570. A psychologist opined:

> [T]here is no clear cut answer to the decision of whether to leave [C.J.R.] in the Custody of [Foster Parents] or place her in Indiana with her grandparents. Instead, there are relative strengths and disadvantages to both possible outcomes.

*Id.* at 573. The mother, in support of her position that custody should be transferred to her parents, relied upon the public policy in Pennsylvania of placing siblings, including half-siblings, together whenever possible and absent compelling reasons to the contrary. *Id.* The trial court concluded the benefits and bonds from a sibling relationship did not justify removing C.J.R. from her foster parents and placing her with her grandparents. *Id.* The appellate court, applying an abuse of discretion standard of review, affirmed the trial court's judgment, noting, "this factor, [placement with a sibling] cannot be automatically elevated above all others, but must be weighed in conjunction with the others." *Id.*

Likewise, in *John B.,* a New York appellate court reversed the trial court's judgment placing a child, Georgina, with a

woman who was planning to adopt the child's half-brother, Ralph, instead of with the child's foster parents with whom the child had lived since she was approximately four months old. 735 N.Y.S.2d at 334–36. The appellate court held the finding that it was more important for Georgina and Ralph to remain together than it was for Georgina to remain in the only home she had ever known was not supported by the record. *Id.* at 336.

The Smiths argue that section 162.302(e) "codifies" prior Texas case law holding that siblings may not be separated absent a showing of clear and compelling reasons. They cite *In re De La Pena*, 999 S.W.2d 521, 535 (Tex.App.-El Paso 1999, no pet.); *Pizzitola v. Pizzitola*, 748 S.W.2d 568, 569 (Tex.App.-Houston [1st Dist.] 1988, no writ); *Dalton v. Doherty*, 670 S.W.2d 422, 424 (Tex.App.-Fort Worth 1984, no writ); *Zuniga v. Zuniga*, 664 S.W.2d 810, 812 (Tex.App.-Corpus Christi 1984, no writ); *O. v. P.*, 560 S.W.2d 122, 127 (Tex.Civ. App.-Fort Worth 1977, no writ); and *Griffith v. Griffith*, 462 S.W.2d 328, 330 (Tex. Civ.App.-Tyler 1970, no writ).

We have carefully reviewed each of the cases cited by the Smiths. We cannot agree that these cases require us to read a clear-and-compelling-reasons burden of proof into section 162.302(e). First, none of these cases are adoption cases. They are custody cases. *See In re De La Pena*, 999 S.W.2d at 524 ("[i]n this child custody case, Elsa Doss appeals from an order appointing her brother, Caesar De la Pena, as a joint managing conservator of his daughter"); *Pizzitola*, 748 S.W.2d at 569 ("[t]his is an appeal from an award of child custody in a divorce action"); *Dalton*, 670 S.W.2d at 423 ("[t]his is an appeal from a trial court order modifying the terms and conditions of the parties' possession of and access to their two minor children"); *Zuniga*, 664 S.W.2d at 811 ("[t]his is an appeal by Ofelia Zuniga from portions [involving custody] of a judgment rendered in a divorce proceeding"); *O. v. P.*, 560 S.W.2d at 124 ("[t]his is a case involving a suit for change of child custody"); *Griffith*, 462 S.W.2d at 329 ("[t]his appeal involves the proper submission to the jury of special issues regarding the custody of minor children"). Second, the policy of "keeping" siblings together enunciated in these cases necessarily applies only to siblings already living together. *See In re De La Pena*, 999 S.W.2d at 524 (noting children lived together with various relatives from 1991 to 1994); *Dalton*, 670 S.W.2d at 423 (children resided with father after divorce); *O. v. P.*, 560 S.W.2d at 124 (noting mother had custody of both children after divorce); *Griffith*, 462 S.W.2d at 329 (noting both mother and father sought custody of the four children of the marriage). Third, courts have traditionally applied the policy of keeping siblings together in custody decisions only to children of the same marriage, i.e., not to half-siblings. *See In re De La Pena*, 999 S.W.2d at 535 ("[t]he record reflects that Christine and Albert are full-blooded siblings"); *Pizzitola*, 748 S.W.2d at 569 (recognizing clear and compelling reasons for split custody did not apply in cases where the children involved were of prior marriages); *Dalton*, 670 S.W.2d at 423 (noting parties were challenging order modifying their possession and access to their two minor children); *O. v. P.*, 560 S.W.2d at 124 (noting parties had two children from their marriage); *Griffith*, 462 S.W.2d at 329 (noting both mother and father sought custody of the four children of the marriage). *But see Zuniga*, 664 S.W.2d at 812–14 (holding trial court did not abuse its discretion in granting custody of youngest child with mother and custody of three older children with father).

The present case is not a custody dispute. The Smiths' position that Texas

public policy requires the placement of siblings together absent clear and compelling reasons is limited to *custody* decisions by the trial court. *See In re De La Pena,* 999 S.W.2d at 524; *Pizzitola,* 748 S.W.2d at 569; *Dalton,* 670 S.W.2d at 423; *Zuniga,* 664 S.W.2d at 811; *O. v. P.,* 560 S.W.2d at 124; *Griffith,* 462 S.W.2d at 329. As the *Griffith* court explained:

> One of these guides [for the trial court in a custody case] is that custody of the children of the marriage should not be divided, i.e., awarding custody of one or more of the children to one parent and one or more of the children to the other parent, except for clear and compelling reasons.

462 S.W.2d at 330. The Smiths have not cited and we have not found any authority for the imposition of this clear-and-compelling-reasons burden on an *adoption* statute, section 162.302(e), promulgated by the Legislature.

Moreover, here, D.R.L.M. and A.C. never resided together and are not "children of a marriage," they do not share the same biological father. The policy reasons for placing custody of minor children who have lived their whole lives together with the same parent differ greatly from the considerations involved in determining whether the adoption of a particular child by a particular family is in the child's best interest. We decline to superimpose the clear-and-compelling-reasons burden necessary to justify split custody of children of a marriage upon an adoption statute.

Additionally, the plain language of family code section 162.302(e) does not require siblings to be placed in the same adoptive home *unless* some heightened quantum of proof would justify placing them separately. For example, the statute does not state that it *is* in the children's best interest to place siblings together whenever possible. Rather, the statute only states

that siblings should be placed in the same adoptive home *when* it is in their best interest *and when* it is possible, i.e., prospective adoptive parents are willing to adopt both siblings. Tex. Fam.Code Ann. § 162.302(e). For these reasons, we hold that section 162.302(e) did not require the trial court to impose upon the Martins a heightened, clear-and-compelling-reasons burden of proof to justify placing D.R.L.M. in an adoptive home different than A.C.'s adoptive home.

 The Smiths also argue that section 162.302(e)'s language requiring placement of siblings together when it is in the children's best interest means that "it is the best interest of the child, as determined by TDPRS, that controls." The Smiths argue that when TDPRS provides adoption services it must determine whether placement with a sibling is in the child's best interest and, if so, whenever possible place the siblings in the same adoptive home. Consequently, the Smiths argue the trial court should have implemented TDPRS's adoption plan to place D.R.L.M. in the same home with her half-sibling, A.C., because TDPRS had determined this would be in D.R.L.M.'s best interest.

We have found no authority for the proposition that TDPRS's recommendation as to adoptive placement of a sibling constitutes a "best interest" determination that is binding on the trial court. To the contrary, family code section 162.016(b) authorizes a trial court to grant an adoption only if it finds adoption is in the best interest of the child. *See id.* § 162.016(b) (Vernon 1996). We will not construe family code section 162.302(e) as authorizing TDPRS to make a binding best interest determination when section 162.016 places responsibility for that finding on the trial court.

■ Having determined that section 162.302(e) did not impose a heightened quantum of proof upon the Martins, we simply review the trial court's adoption best interest determination under an abuse of discretion standard, and we consider the factual and legal sufficiency of the evidence to support the trial court's action as one relevant factor in our analysis. *See In re Doe 2,* 19 S.W.3d at 281; *In re J.R.P.,* 55 S.W.3d 147, 151 (Tex.App.-Corpus Christi 2001, pet. denied). The trial court has wide latitude in determining the best interest of a minor child. *In re J.R.P.,* 55 S.W.3d at 151 (citing *Gillespie v. Gillespie,* 644 S.W.2d 449, 451 (Tex.1982)). We will reverse the judgment of the trial court only when it appears from the record as a whole that the court has abused its discretion. *Id.* To determine whether a trial court abused its discretion, we must decide whether the trial court acted without reference to any guiding rules or principles; in other words, whether the act was arbitrary or unreasonable. *See Garcia v. Martinez,* 988 S.W.2d 219, 222 (Tex.1999). Merely because a trial court may decide a matter within its discretion in a different manner than an appellate court would in a similar circumstance does not demonstrate that an abuse of discretion has occurred. *Downer v. Aquamarine Operators, Inc.,* 701 S.W.2d 238, 241–42 (Tex.1985), *cert. denied,* 476 U.S. 1159, 106 S.Ct. 2279, 90 L.Ed.2d 721 (1986). An abuse of discretion does not occur where the trial court bases its decision on conflicting evidence. *Davis v. Huey,* 571 S.W.2d 859, 862 (Tex. 1978); *see also Holley v. Holley,* 864 S.W.2d 703, 706 (Tex.App.-Houston [1st Dist.] 1993, writ denied).

■ The trial court issued findings of fact and conclusions of law and specifically found: "the appointment of Patrick and Sueanne [Smith] as the Managing Conservators of the Child is not in the Child's best interest"; "the appointment of Joe and Jean [Martin] as the Managing Conservators of [D.R.L.M.] is in the best interest of [D.R.L.M.]"; and the adoption of D.R.L.M. by the Martins is in the best interest of D.R.L.M. The trial court made no express finding that placement of D.R.L.M. in the same adoptive home with her half-sister, A.C., was not in D.R.L.M.'s best interest. This finding, however, is implied in favor of the trial court's judgment, especially in light of the trial court's express finding that the appointment of the Smiths, A.C.'s adoptive parents, as D.R.L.M.'s managing conservators was not in D.R.L.M.'s best interest and that the adoption of D.R.L.M. by the Martins was in D.R.L.M.'s best interest. *See* Tex.R. Civ. P. 299; *see also In re De La Pena,* 999 S.W.2d at 536 (implying finding that separation of child from brother was not in child's best interest in light of judgment appointing father with possession of brother as managing conservator of child).

We review the entire record to determine whether the trial court abused its discretion by impliedly finding that placement of D.R.L.M. in the same adoptive home with A.C., i.e., the Smiths' home, was not in D.R.L.M.'s best interest. We necessarily also review under an abuse of discretion standard the trial court's express findings that the appointment of the Smiths as D.R.L.M.'s managing conservators was not in D.R.L.M.'s best interest, that the appointment of the Martins as D.R.L.M.'s managing conservators was in D.R.L.M.'s best interest, and that the adoption of D.R.L.M. by the Martins was in D.R.L.M.'s best interest because each of these findings would preclude placement of D.R.L.M. in the same adoptive home with A.C.

There is no question both the Smiths and the Martins were willing to provide and capable of providing an excellent home

for D.R.L.M. The evidence concerning the character and loving personalities of the Smiths and the Martins is equally stellar. Our focus, however, based on the issue presented by the Smiths, is whether the trial court abused its discretion in determining that placement of D.R.L.M. with the Smiths was not in D.R.L.M.'s best interest. We consequently closely review the evidence presented by the parties' experts concerning D.R.L.M.'s best interest.

Fred Thomas, a psychotherapist, testified on behalf of the Smiths. At the time he testified, he had not met the parties in this case. He testified that a child's ability to bond with a family would be enhanced by the presence of a biological sibling. Moving a child under three years of age, he admitted, would be stressful, but not traumatic. On cross-examination he conceded, however, that it could be very harmful to change the primary caregiver of a child under the age of three. The "possible" consequences of removing a child from their longest caregiver include: failure to thrive, inability to interact in their environment, poor school performance, impulsiveness, inability to bond with others, problems in relationships, poor self-identity, and self-esteem problems that could develop into eating disorders.

Harry Baker, a psychologist, testified on behalf of the Martins. He said that he met with the Martins twice, for about ninety minutes each time and that D.R.L.M. was attached to the Martins. Baker further testified:

Q. If you had to choose between a caregiver who a child is bonded to or attached to and a potential relationship with a sibling, which would you choose and why?

A. Well, I would choose the relationship where the child is, you know, already—that is the child's world, the family that he or she is attached to, and the reason why is because that is critically important in a child's development. You can't break that. The stronger the attachment, if it's disrupted, the more damage that's done to the child. The longer the attachment has been there, the more damage it is to the child, and you know, I perceive it as probably 90 percent of importance in assessing what should be done with the child is the quality of attachment.

. . . .

Q. Well, let's assume that the [Smiths] were the absolute best parents in the world. Would that make any difference to you?

A. It really wouldn't. If [D.R.L.M.] had been placed with the [Smiths] and we were here, I would be arguing just— and I just observed even adequate, not to mention good, caretaking on their part, I would be arguing just as strongly in favor of the [Smiths].

Q. From what you were told, how many caretakers has [D.R.L.M.] had?

A. Well, there is at least, before the [Martins], as least two, her biological mother and biological father, and there was also reported that at least perhaps as many as four occasions she was left with others for more than a short period of time, and those people are kind of shadowy as to who they are, but they were friends or acquaintances of the biological parents.

Q. What could one more move do to [D.R.L.M.]?

. . . .

A. Well, as Bolby (phonetic) says, what happens is that when you get traumatic events that happen to a child, then you get an almost geometric effect as you add on traumatic events, that they sort of—what's the word?—energize

each other, and you get a worse, you get a more and more damaging outcome, so what could happen is that this just exacerbates the previous whatever it was, abandonment, feelings of rejection, on the part of [D.R.L.M.]

. . . .

Q. Is a move a risk worth taking?

A. Oh, I don't think so.

Q. Why?

A. For the reasons I've given. She has been in the [Martins'] home now for 18 months. This had been a—she's still is in a very formative period. This is her world. I mean, there is no difference between the way she sees the [Martins] and the way you or my child at two sees the parents psychologically. There is not a bit of difference.

 In light of this evidence and testimony, we cannot hold the trial court abused its discretion in determining placement of D.R.L.M. in the same adoptive home with her half-sister was not in D.R.L.M.'s best interest. Likewise, in light of this evidence and testimony, we cannot hold that the trial court abused its discretion in determining appointment of the Smiths as D.R.L.M.'s managing conservators was not in D.R.L.M.'s best interest. Abuse of discretion does not exist as long as there is *some* evidence of a substantive and probative character to support the decision. *Holley*, 864 S.W.2d at 706. The substantive and probative expert testimony outlined above also supports the trial court's determinations that the appointment of the Martins as D.R.L.M.'s managing conservators was in D.R.L.M.'s best interest and that the adoption of D.R.L.M. by the Martins was in her best interest.

Additionally, because this evidence constitutes more than a scintilla of evidence, the trial court's best interest findings are supported by legally sufficient evidence.

*See Cazarez*, 937 S.W.2d at 450; *Leitch v. Hornsby*, 935 S.W.2d 114, 118 (Tex.1996). We further hold that evidence in support of the trial court's best interest findings is not so weak, or the evidence to the contrary so overwhelming, that the findings should be set aside; the evidence supporting these findings therefore is factually sufficient. *See Garza v. Alviar*, 395 S.W.2d 821, 823 (Tex.1965). Thus, factoring the sufficiency of the evidence to support the trial court's best interest findings into our abuse of discretion analysis only confirms that the trial court did not abuse its discretion in its best interest findings. We overrule the Smiths' first and second issues.

## V. TDPRS's Cross Points.

 The trial court's termination and adoption order provided, "All papers and records in this case, including the minutes of the Court, are ordered sealed." In two cross-points, TDPRS complains that the trial court lacked authority to order the reporter's record in this case sealed. Alternatively, TDPRS asserts that "the seal was forfeited" when the reporter's record was released to appellants without restriction and when appellants disclosed the contents of the record by filing their briefs. TDPRS requests this court to sustain its cross-points, declare the record unsealed, shred the affidavits required of TDPRS when it checked out the sealed records, and advise the trial court to never attempt to seal the record in this manner again.

Section 161.210 of the family code provides:

The court, on the motion of a party or on the court's own motion, may order the sealing of the file, the minutes of the court, or both, in a suit for termination. TEX. FAM.CODE ANN. § 161.210 (Vernon 1996). Section 162.021 of the family code is titled, "Sealing File," and it provides:

(a) The court, on the motion of a party or on the court's own motion, may order the sealing of the file and the minutes of the court, or both, in a suit requesting an adoption.

*Id.* § 162.021(a). TDPRS acknowledges these statutes, but contends that they do not authorize the trial court to seal the reporter's record. According to TDPRS, the reporter's record is not part of the "file" and is not sealable at all by the trial court. We cannot agree.

TDPRS's construction of sections 161.210 and 162.021 would render them meaningless. If the court reporter's stenographic notes, transcription of those notes, and the exhibits offered into evidence at trial are not subject to a sealing order such as the one at issue, then in effect, the entire trial record is not sealed and is available to the public. We will not construe sections 161.210 and 162.021 in a manner that renders them meaningless and ineffectual. *See, e.g., Attorney General v. Redding*, 60 S.W.3d 891, 895 n. 2 (Tex.App.-Dallas 2001, no pet.) (recognizing appellate courts will not construe a statute so as to render certain provisions meaningless); *In re Marriage of Richards*, 991 S.W.2d 32, 37 (Tex.App.-Amarillo 1999, pet. dism'd) (recognizing the courts have no right or prerogative to add to or take from such a legislative enactment, or to construe it in such a way as to make it meaningless). We overrule TDPRS's first cross-point.

■ In its second cross-point, TDPRS complains the sealing order was waived in this court and complains of procedures utilized by this court to ensure compliance with the trial court's sealing order. The trial court ordered the records sealed, presumably for the benefit of D.R.L.M. Consequently, we hold the parties may not waive the sealing order. If the parties desire the record unsealed, they should seek an order from the trial court. We decline to hold that the parties may waive the applicability of a trial court order.

TDPRS's complaints concerning the procedures utilized by this court to ensure the trial court records, which become this court's records when filed here, remain sealed are not proper grounds to be raised in a cross-point. *See* TEX.R.APP. P. 38.2(b) (discussing matters that may be raised by cross point); *Id.* 43.2 (setting forth the types of judgments courts of appeals may render). Thus, we will not review this court's alleged procedural impropriety in this appeal. Accordingly, we overrule TDPRS's second cross-point.

## VI. CONCLUSION.

Having sustained Kristi's first issue, we modify the trial court's September 20, 2001 Order of Termination and Decree of Adoption by deleting subsection 7(b), located on pages two and three of the order and decree to eliminate the trial court's finding that D.R.L.M.'s mother "knowingly engaged in criminal conduct that has resulted in her conviction of an offense and confinement or imprisonment and inability to care for the child for not less than two years from the date the petition was filed." Having overruled all of Kristi's other issues, the Smith's issues, and TDPRS's cross-points, we affirm the trial court's judgment as modified.