COURT OF APPEALS

SECOND DISTRICT OF TEXAS

FORT WORTH

NO. 2-07-007-CV

IN THE INTEREST OF J.F., J.J., AND J.J., CHILDREN 

------------

FROM THE 323RD DISTRICT COURT OF TARRANT COUNTY

------------

MEMORANDUM OPINION
(footnote: 1)

------------

I.  Introduction

In two points, Appellant, the Department of Family and Protective Services (“DFPS”), appeals that portion of the trial court’s ruling that denied the request for termination of the parental rights of the parents.  We reverse and remand.

II.  Factual History

A.  Julie, Jennifer, and Brandy F.

Appellees Brandy F. and Melburn J. are the parents of the children John, Julie, and Jennifer.
(footnote: 2)  The oldest child, John, a male, was seven years old; the middle child, Julie, a female, was six years old; and the youngest child, Jennifer, was four years old. 

Evidence indicated that Julie and Jennifer were sexually abused by their maternal grandfather, intervenor Danny De Los Santos (“Grandfather Danny”).  During a therapy session with Laura Greuner, a therapist who specializes in working with children who have been sexually abused and who suffer from post-traumatic stress disorders, Julie confided that she had been sexually abused by her “Grandpa Danny.”  She told Gruener that her grandfather had touched her private area four times, and she described how he would pull her pants down and touch her.  Jennifer, in a counseling session with the same therapist, told her that Grandfather Danny required both her and her sister Julie to “get naked.”  He also touched both of them.  Gruener testified, “[S]he said to me that [Grandfather] Danny touched us here and she touched herself on her private area over her clothes to show me what she was talking about”; Gruener also testified that Jennifer appeared to be upset when relating this account to her.  Jennifer also told Gruener that she had been warned by Grandfather Danny that if she told of this event, she would never see her mother again. 

Julie also confided to Virginia Caldwell, a registered nurse at Cook Children’s Hospital who had an advanced certification as a forensic nurse examiner specializing in sexual assault exams, that Grandfather Danny had put a “pink stick” in her genital area and in her “butt.”  Julie said that her clothes were off when this happened, and that it hurt.  Julie had also told Brandy about essentially the same sexual abuse.  Dr. Parnell Ryan, who conducted a psychological evaluation of Julie, described Julie as a little girl struggling with sadness who advised him that her grandfather had fondled her vagina. 

Brandy was aware of the sexual tendencies of her father, Grandfather Danny.  In her trial testimony, Brandy testified that Grandfather Danny started making sexual advances toward her when she was thirteen and fourteen years old.  She also testified that at the time of these sexual advances, she told her mother about what had occurred.  Her trial testimony was corroborated by her admission to nurse Virginia Caldwell, who, while gathering social history during the examination of Julie, was told by Brandy about the “advances” of Grandfather Danny toward Brandy.  Brandy also testified that she believed in March 2004 (when Julie made her initial sexual abuse outcry) that Grandfather Danny had sexually penetrated Julie, and that as of the date of her trial testimony, she believed that the sexual abuse to Julie had occurred.  Despite knowing that Grandfather Danny had made sexual advances to herself as a child of thirteen and had also sexually abused her daughter Julie in March 2004, Brandy sent her children to live with Grandfather Danny in September 2004.  According to Brandy’s testimony, it was then that DFPS “stepped back in her life” and demanded that she remove the children from Grandfather Danny’s home.

B.  The Safety Plan

DFPS worker Christiana Smith began working with the family in December 2004.  Her role, as a Family Based Safety Services worker, was to provide parent and counseling services and to attempt to negate the issues that had caused Brandy and Melburn’s family to come to the attention of DFPS.  To accomplish this, a “safety plan” was agreed to between Brandy and DFPS that included a prohibition of any contact between John, Julie, and Jennifer and Grandfather Danny.  Brandy also agreed to individual therapy for herself, individual therapy for the children, parenting classes, random drug tests to insure that she was drug free, and participation in a drug assessment if any drug tests were positive.

As a result of the agreed-upon drug testing, Brandy tested positive for marijuana and pain killer medication.  In April 2005, this safety plan violation resulted in the children’s being required to stay with Brandy’s mother, Robin F., who was to supervise all contact between the children and mother.  Thereafter, Robin’s boyfriend, Terry Bowers, began to exhibit signs of alcohol abuse.  Bowers appeared at her home at 2:00 a.m. drunk, screaming, and banging on the door.  As a result, DFPS requested that he participate in treatment to address his alcohol abuse.

Caseworker Smith continued to provide services to Brandy, including providing bus passes for transportation and actually personally driving Brandy to some of the provided services.  However, Brandy was dropped from her drug abuse classes for noncompliance, the children were not taken to counseling (even though DFPS paid for this service and agreed to assist in transportation), and Brandy was caught by a DFPS worker having unsupervised contact with the children by taking them to school and picking them up from school by herself, in violation of the safety plan.

In addition, Brandy allowed Grandfather Danny to be in the car with the children as they traveled to a counseling session with Gruener, a situation that concerned Gruener because it was a safety plan violation and because the children were being taken to the therapy sessions where they were likely to talk about the sexual abuse perpetrated on them by the same man who would be driving them home following the therapy session.  Finally, DFPS discovered that Brandy had allowed the children to have contact with Grandfather Danny at a Chuck E. Cheese restaurant when Jennifer told Gruener that Danny warned her that if she told anyone about the Chuck E. Cheese meeting, she would never see her mom again.  Brandy admitted to this “Chuck E. Cheese safety plan violation” and admitted that she was actually present at the restaurant when it occurred.  Brandy admitted that her violations of the various safety plans were numerous and that she violated these agreements every single day.

C.  Domestic Violence

In October 2005, the children were removed from Robin’s care and placed in foster care.  Once in foster care, the children told of many other instances of exposure to abuse and neglect, including regularly witnessing domestic violence between their parents.  Brandy admitted in her testimony at trial that she and Melburn had exposed the children to violent confrontations and testified to examples of these instances, describing one instance in which each parent was hitting each other in the mouth while in a car, with John and Julie watching.  Brandy described the “assault in the vehicle” to CASA volunteer Randee Kaitcer, telling her that Melburn punched her in the mouth and made her bleed.  Kaitcer confirmed that Julie witnessed this bloody assault.  Julie further described instances in which the two parents would yell and scream, and Melburn would grab Brandy and push her up against something to shut her up.  Brandy admitted that John would clearly be affected by the violence, and that he yelled at his father to stop hitting his mother.  Brandy also testified that the children were present during most of her domestic violence fights, and they would usually have to be pulled from the room by family members.

As a result of witnessing this violence, John confided to Gruener that he had witnessed his father hitting his mother and that he was angry, and now  he “acted out” his anger.  John advised therapist Dr. Balla that he did not want to be like his dad, and he did not want to be so aggressive and violent like Melburn.  Julie told Gruener that she had seen her father hit her mother, that it made her mother bleed, and that she was “scared about that.”  She also confided to the psychologist, Dr. Ryan, that she had witnessed her father punching her mother in the face and that she had been exposed to the violence between her parents.

Brandy and Melburn also exposed the children to sexual acts between the parents.  Brandy’s explanation was that, since all of the family lived in one room, she and Melburn proceeded to do what “adults do.”  John told Dr. Ryan that based upon his exposure to watching his parents, he was acting like his parents and was attempting to perform such acts on his sister.  Julie confirmed this by telling Dr. Ryan that her brother John lay on top of her and slobbered on her neck, describing this as “sex” because she saw her mother and father do this.  Nevertheless, there was also testimony that the children loved their mother and had a bond with her.

D.  Overall Compliance

By the time this case went to trial, Brandy had failed to complete her drug classes (having been discharged three times for noncompliance), had not taken GED classes, had not attended nonoffender sexual abuse classes, had not attended her therapy sessions for domestic violence, and was virtually noncompliant with her individual therapy.

E. The Father

Melburn had been convicted on two separate occasions for felony offenses, and Brandy told Kaitcer that Melburn had been in and out of incarceration throughout their entire eight-year relationship.  Melburn was still incarcerated, both when he initially filed a pro se “answer” to the termination suit in which he stated, “At this point [in] time I don’t have any family on my side to care or take custody of my children,” and at the time of trial.  In this “answer”/correspondence to the trial court, he also asked certain questions about the children, which questions were not addressed by DFPS.  At some point Kaitcer, the CASA volunteer, answered these questions and corresponded with Melburn, at one point asking him about family members willing to take care of the children.  Melburn provided her with the name of his mother, Joanne J., and on June 16, 2006, Kaitcer forwarded that information to the DFPS caseworker, the CASA supervisor, and the ad litem. 

F.  Paternal Grandmother

In August 2005, the month before proceeding to a final trial on the merits, DFPS sent a certified letter to paternal grandmother Joanne J. (“Grandmother Joanne”)—also known as Joanne De Los Santos—asking if she wanted to be a placement option for the children.  DFPS had been aware of her existence since at least the time of the removal of the children; the removal affidavit attached to the petition listed her (by the name of Joanne De Los Santos) as one of the people with whom the children had lived within the past five years.  However, DFPS made no attempt to approach Grandmother Joanne until August 2005.  At the time of trial,  Grandmother Joanne had completed the paperwork necessary to start the process known as a “home study,” but the home study had not been completed.

Grandmother Joanne testified that she wanted the children to be placed with her and her husband Alfredo De Los Santos, who is the brother of Grandfather Danny.  However, Brandy testified that she did not believe that anyone in Melburn’s family was appropriate to take care of the children.  Grandmother Joanne testified that she did not believe the sexual abuse outcries of her grandchild Julie and that Julie loved Danny and therefore there was no way that the sexual abuse by Danny could have occurred.  Grandmother Joanne was confused in her testimony about how long it had been since she had had contact with the children, but she testified that it could have been three years since the children had lived with her.

Grandmother Joanne also said that she had at one time lived in Midlothian, Texas, but had moved to this area in an attempt to hide from her own brother, who had murdered her mother.  She testified that there were five people living in her three-bedroom mobile home, and that there were only sixty-five dollars left in her household account each month after all expenses were paid.  Grandmother Joanne also admitted that she had been investigated by DFPS on one occasion and had been arrested and placed on probation for assault.  She testified that DFPS had begun the process of a home study on her by sending a packet of home study paperwork to her approximately one month before trial, which was approximately two days after her conversation with DFPS.  She testified that she had returned the paperwork to DFPS on September 18, seven days before trial, and that the delay was due to the paperwork’s being forgotten and placed on the dashboard of her husband’s car.

III.  Procedural Background

Upon the removal of John, Julie, and Jennifer from Brandy and Melburn, DFPS filed on October 19, 2005, its “Petition for Protection of a Children, for Conservatorship, and for Termination in Suit Affecting the Parent-Child Relationship” in which DFPS requested, inter alia, that Brandy’s and Melburn’s parental rights be terminated and a permanent conservatorship be implemented, and its “Order for Protection of Child in an Emergency and Notice of Hearing.” The trial court entered an order naming DFPS as the temporary managing conservator of the children, and it further found that there would be a continuing danger to the children if they were returned to a parent.  Brandy was served with the lawsuit and was also appointed an attorney to represent her in the DFPS litigation.  Brandy filed a general denial on October 27, 2005, and the next day Melburn was served with the lawsuit while he was incarcerated.  On November 7, 2005, the trial court received Melburn’s pro se general denial.  One week later, the trial court conducted the full adversary hearing.  The court made a specific finding that “placement of the children with the children’s noncustodial parent or with a relative of the children is inappropriate and not in the best interest of the children.”  In its judgment, styled “Order Modifying Managing Conservatorship” and dated December 20, 2006, the court appointed DFPS as permanent managing conservator of the children, but it did not order termination of parental rights
(footnote: 3) for reasons to be discussed.

IV.  Sanctions

In two points, DFPS asserts error on the part of the trial court by concluding as a matter of law that DFPS’s failure to timely comply with a portion of Texas Family Code
 section 262.114 prevented the trial court from making a determination on the pleadings seeking termination of the rights of the parents as to both statutory grounds for termination under Texas Family Code 
sections 161.001(1)(D)-(E) and the “best interest” requirement for termination under Texas Family Code
 section 161.001(2).  
Tex. Fam. Code Ann.
 §§ 161.001(1)(D)-(E), 161.001(2), 262.114(a) (Vernon Supp. 2006).

A. The Statute

Texas Family Code section 262.114 reads as follows:

Before a full adversary hearing . . . the Department of Family and Protective Services 
must 
perform a background and criminal history check of the relatives or other designated individuals identified as a potential relative or designated caregiver . . . on the proposed child placement resources form . . . . The department shall evaluate each person listed on the form to determine the relative or other designated individual who would be the most appropriate substitute caregiver for the child and must complete a home study of the most appropriate substitute caregiver, if any, before the full adversary hearing.  Until the department identifies a relative or other designated individual qualified to be a substitute caregiver, the department must continue to explore substitute caregiver options.

Id
. § 262.114(a) (emphasis supplied).

The trial court’s judgment denied DFPS’s request to terminate parental rights because DFPS was not in complete compliance with section 262.114.
(footnote: 4)  This reasoning is confirmed by an examination of the record and exchanges between DFPS counsel and the court.
(footnote: 5)  In essence, the trial court determined that the appropriate sanction for DFPS’s failure to complete the home study on Grandmother Joanne was for the trial court not to consider, and hence deny, DFPS’s request for termination both on statutory grounds and “best interest” grounds.  The trial court’s conclusions of law reiterated this as follows:

1.  The Court concludes as a matter of law, that the provisions of Texas Family Code, Section 261.114 entitled Evaluation of Identified Relatives and Other Designated Individual; Placement, create mandatory actions to be taken by the Department of Family and Protective Services.

. . . . 

3.  The Court concludes as a matter of law that the failure of the department to comply with the provisions of Texas Family Code, Section 262.114 prevents the Court from making a determination on the pleadings seeking termination of the rights of Respondent parents, as to grounds for termination.

4.  The Court concludes as a matter of law that the failure of the department to comply with the provisions of Texas Family Code, Section 262.114 prevents the Court from making a determination on the pleadings seeking termination of the rights of Respondent Parents, as to the “best interest” requirement.

The statute itself, however, provides no sanction for the failure to perform a home study on all possible placement options, nor does it prevent the trial court from considering termination.  Therefore, it is the trial court’s determination that this preclusion of consideration of termination was an appropriate sanction that is the subject of this appeal.  

B.  Melburn’s and Brandy’s Responses

Melburn and Brandy initially responded to DFPS’s points by asserting that any error committed by the trial court was invited by DFPS and, therefore, any assertion of that error has been waived.  Specifically, Melburn asserts that by not joining Brandy’s motion for an extension of the dismissal date, which would have allowed up to an additional 180 days for trial and the opportunity to complete the home study in question, DFPS invited error by the court.  Melburn and Brandy further assert that by submitting a judgment containing the sanction language of which DFPS now complains, DFPS has waived its present complaint.  We reject these arguments.  

First, the sanction question before this court appears to be one of first impression, and DFPS could not have known that by going to trial when it did that the sanction for its failure to complete the home study on one individual would be the refusal of the trial court to consider the requested termination.  Second, the judgment submitted by DFPS was approved by them as to form only and was based on the visiting trial judge’s oral pronouncement in court.  This court has previously held, “A party should not be estopped from challenging a court’s order when the party provides to the court a proposed order following what it believes was the court’s ruling at the hearing, and the court signs it.”  
In re Bahn
, 13 S.W.3d 865, 875 (Tex. App.—Fort Worth 2000, no pet.); 
see also Hardy v. Mann
, No. 01-05-010800-CV, 2007 WL 1299661, at *15 (Tex. App.—Houston [1st Dist.] May 3, 2007, pet. filed)
; John Masek Corp. v. Davis
, 848 S.W.2d 170, 174-75 (Tex. App.—Houston [1st Dist.] 1992, writ denied)
.  This is particularly true when the motion to enter judgment recites that the proposed order is recounting the oral pronouncement of the court and docket entry and that the proposed order is agreed to by the party as to its form and not as to its substance.

DFPS, for its part, asserts that Brandy and Melburn waived their rights under section 262.114 of the family code by failing to request the trial court to order compliance with the statute.  We reject this argument because it attempts to shift the burden articulated by the statute and is contrary to the plain language of the statute indicating that it is DFPS, and not the parents, that has a duty to perform, that is, to complete the requisite home studies.

C.  Appropriateness of the Sanction

As previously recounted, the statute does not prescribe a sanction or consequence of DFPS’s failure to complete one of the requisite home studies.  As articulated by our Texas Supreme Court, “We should not invent a remedy that the Legislature itself could have, but did not, specify.”  
State v. Roland
, 973 S.W.2d 665, 666 (Tex.) (citing
 Hines v. Hash
, 843 S.W.2d 464, 467 (Tex. 1992)), 
cert. denied
, 525 U.S. 935 (1998).  Further, 

[t]here is no presumption or general rule that for every duty imposed upon the court or the Government and its prosecutors there must exist some corollary punitive sanction for departures or omissions, even if negligent.  In our view, construction of the Act must confirm to the great principle of public policy, applicable to all governments alike, which forbids that the public interests should be prejudiced by the negligence of the officers or agents to whose care they are confided.

State v. $435,000.00
, 842 S.W.2d 642, 644 (Tex. 1992).

“This is not the only statute that says something ‘must’ be done but does not say what happens if it is not.”  
In re Francis
, 186 S.W.3d 534, 540 (Tex. 2006) (orig. proceeding).  Examples in cases include, as enumerated in the 
Francis 
case, 
Hines
, 843 S.W.2d at 467 (holding that DTPA’s mandated notice requirement was served, not by tossing out noncomplying consumers, but by abating the suit); 
Hubenak v. San Jacinto Gas Transmission Co.
, 141 S.W.3d 172, 184 (Tex. 2004) (determining consequences of condemning authority’s failure to negotiate land price as statutorily mandated); 
Lubbock County, Texas v. Trammel's Lubbock Bail Bonds
, 80 S.W.3d 580, 584 (Tex. 2002) (determining that consequences of following mandatory procedure is abatement until procedure is followed); 
Helena Chemical Co. v. Wilkins
, 47 S.W.3d 486, 494 (Tex. 2001) (determining consequence of failure to submit claim to arbitration within statutory period);
 $435,000.00
, 842 S.W.2d at 644 (holding that dismissal is not a consequence of State’s mandatory duty to hold forfeiture hearing within the prescribed time); 
Schepps v. Presbyterian Hospital of Dallas
, 652 S.W.2d 934, 938 (Tex. 1983) (determining that the purpose of the mandatory notice requirement was better served by abating cause of action to allow intended negotiations rather than terminating plaintiff’s substantive rights).

“When [a] statute is silent about consequences of noncompliance, we look to the statute’s purpose in determining the proper consequence of noncompliance.”  
Albertson’s, Inc. v. Sinclair
, 984 S.W.2d 958, 961 (Tex. 1999); 
see also Hines
, 843 S.W.2d at 468; 
Francis
, 186 S.W.3d at 540.  We should start with the presumption that the legislature intended a just and reasonable result in enacting a statute,
 In re D.R.L.M.
, 84 S.W.3d 281, 290 (Tex. App.—Fort Worth 2002, pet. denied), and when determining its purpose inquire if that purpose is better served by a different consequence than that propounded by the trial court, 
Hines
, 843 S.W.2d at 468.  

We now turn to the purpose of this statute.  Reading the plain language of the statute itself and referring to the bill analysis of the Senate’s Committee on Health and Human Services, that purpose is obvious: the protection of innocent children.  Reading from the analysis of the overall bill, of which section 262.114 is a part, we read that

C.S.S.B. 6 seeks to strengthen the state’s ability to protect society’s most vulnerable citizens: abused children, the elderly, and the frail.  The bill responds to the governor’s executive orders calling for the systematic reforms of Child and Adult Protective Services.  These orders came in response to numerous cases in which children and elderly persons were left in states of abuse or neglect, despite agency involvement, resulting in severe harm or even death.

S. Comm. on Health and Human Services, Bill Analysis
, Tex. S.B. 6, 79th Leg., R.S., at 1 (2005).  With regard to the specific section of the bill in question, we also read that Section 262.114(b)

Requires DFPS to place a child only if DFPS determines that the placement is in the best interest of the child.  Authorizes DFPS to place the child with the relative or designated individual before conducting the required home study, only in exigent circumstances, as determined by DFPS on an individual basis.  
Requires DFPS to consider the child’s safety to be the paramount concern in determining the placement of the child.

Id
. at 7 (emphasis supplied).  

Considering the foregoing, we conclude that it is the safety of children that is of paramount importance; and considering the statute’s purpose and the background of this case, we hold that the purpose of this statute is better served with a consequence different from that propounded by the trial court, in that a preclusion of consideration of termination under these circumstances cannot possibly be in the best interest of the welfare of these children.

We now turn to the propriety of the sanction imposed by the trial court, which amounts to a “death penalty” sanction as to the issue of termination.  

D.  “Death Penalty” Sanction

By refusing to consider the termination request made by DFPS, and thereby denying the request, the trial court in essence issued a “death penalty” sanction against DFPS as to that requested relief.  In civil discovery abuse cases, there must first be a direct relationship between the offensive conduct and the sanction imposed, and secondly, the sanction must not be excessive but must “fit the crime,” that is, the court must consider the availability of less stringent sanctions and whether such sanctions would promote compliance.  
TransAmerican Nat. Gas Corp. v. Powell
, 811 S.W.2d 913, 917 (Tex. 1991) (orig. proceeding).  We believe that the same reasoning applies to the situation before us.  

This court has previously been faced with a situation in which the trial court failed to hold a full adversary hearing not later than the fourteenth day after the Texas Department of Protective and Regulatory Services (TDPRS) took possession of a child pursuant to an ex parte temporary order.  
See
 
Tex. Fam. Code Ann.
 § 262.201(a) (Vernon 2005); 
In re J.M.C., 
109 S.W.3d 591, 595 (Tex. App.—Fort Worth 2003, no pet.).  We held that under that situation, the proper remedy was for the parents and TDPRS to mandamus the trial court to conduct the adversary hearing promptly.  
J.M.C.
, 109 S.W.3d at 595.  Analogously, one remedy for the failure of DFPS to complete Grandmother Joanne’s home study in a timely manner was for the trial court, either on motion of the parents or sua sponte, to order DFPS to complete the study as soon as possible and prior to a trial on the merits. 

We hold that the sanction imposed by the trial court, which was in essence a “death penalty” sanction as to the termination of parental rights, was  excessive under the circumstances.

V.  Conclusion

For the foregoing reasons, we sustain DFPS’s two points, reverse the trial court’s order modifying managing conservatorship, and remand this case to the trial court for further proceedings.  
See
 
Tex. R. App. P.
 43.2(d).

BOB MCCOY

JUSTICE

PANEL A: HOLMAN, GARDNER, and MCCOY, JJ.

DELIVERED: October 11, 2007

FOOTNOTES
1:
See 
Tex. R. App. P.
 47.4.

2:
The names of all minors in this case have been changed; J.F. will be referred to as John, the older J.J. as Julie, and the younger J.J. as Jennifer.

3:
“IT IS ORDERED that all relief requested and not expressly granted herein is hereby denied.”

4:
“The Court finds that CPS failed to timely comply with Texas Family Code Section 262.114 therefore, termination is denied.”

5:

The Court: . . . . Do you interpret that 262.114 as a “shall” statute?

[Counsel for Melburn]: Yes, Your Honor.

. . . . 

The Court: Well, I’ll go back to where I was a moment ago with it being a “shall” statute, and in my opinion that the short period of time that the State has given or CPS has given the paternal grandmother to respond, in my view, they have not yet complied with that statute.

. . . . 

The Court: . . . . I just simply stated that 262.114 is sort of a gatekeeper type of process.

[Counsel for State]: Okay.

The Court: And they didn’t jump through the gate properly.

[Counsel for State]: And the end result is?

The Court: Is termination denied.

[Counsel for Ad Litem]: With no deliberations as to best interest or grounds?

The Court: That’s correct.

. . . . 

[Counsel for State]: . . . . [I]t’s the appellate courts that make the distinction between grounds as opposed to best interest, and it’s quite clear to me that your position is that you could not make a determination on either one of those things because of my client’s failure to comply with that gateway statute, so that’s why I want it to be crystal clear to the Appellate Court that because of my client’s failure, you were not going to be able to consider either the grounds or the best interest analysis.  It was over once the Court determined that my client failed totally in that, with that 262.114 statute.

The Court: Anything further?

[Counsel for Melburn]: Your Honor, I would just for clarification from the Court that that was the Court’s intent that --

The Court: Clearly it was.

[Counsel for Melburn]: All right.

The Court: Clearly it was.