

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

_____

No. 02-21-00153-CV

_____

IN THE INTEREST OF M.M., D.L., J.L., N.L., AND D.L., CHILDREN

On Appeal from the 233rd District Court
Tarrant County, Texas
Trial Court No. 233-679137-20

Before Kerr, Wallach, and Walker, JJ.
Memorandum Opinion by Justice Kerr

## MEMORANDUM OPINION

J.M (Mother) and J.L. (Father) signed irrevocable affidavits relinquishing their parental rights to their children, M.M. (Matt), D.L. (Dan), J.L. (Jane), N.L. (Nate), and D.L. (Dave).[1] Based on these affidavits and findings that termination of Mother's and Father's parental rights was in the children's best interest, the trial court terminated Mother's and Father's parental rights and appointed the Department of Family and Protective Services as the children's permanent managing conservator.

In this ultra-accelerated appeal,[2] Father raises four issues. His first three issues challenge the trial court's finding that he executed an unrevoked or irrevocable affidavit of relinquishment, and he argues in his fourth issue that his appointed trial counsel was ineffective. Mother's appointed appellate counsel has filed an *Anders* brief. We will affirm the trial court's termination order.

## I. Background

In September 2019, the Department sued for temporary managing conservatorship of the children to ensure their immediate safety because of "ongoing concerns [of] physical abuse, physical neglect[,] and neglectful supervision of the

---

[1]We refer to the children using aliases and to other family members by their relationship to the children. *See* Tex. Fam. Code Ann. § 109.002(d); Tex. R. App. P. 9.8(b)(2).

[2]*See* Tex. R. Jud. Admin. 6.2(a), *reprinted in* Tex. Gov't Code Ann., tit. 2, subtit. F app. (requiring appellate court to dispose of appeal from judgment terminating parental rights, so far as reasonably possible, within 180 days after notice of appeal is filed).

children." The children were removed, and the trial court signed an order appointing the Department as the children's temporary managing conservator. Shortly thereafter, the Department amended its petition to seek termination of Mother's and Father's parental rights.

The case was tried to the bench on May 7, 2021.[3] Mother and Father were each represented by appointed counsel. At the start of trial, the trial court bench-filed Mother's and Father's irrevocable relinquishment affidavits, which the parents had executed earlier that day.

Ramon Hodridge, a permanency specialist with Our Community Our Kids (OCOK),[4] testified that the children were removed from the home in September

---

[3]In late July 2020, the trial court timely signed an order extending the case's dismissal date to March 4, 2021, and setting the case for trial on January 26, 2021. *See* Tex. Fam. Code Ann. § 263.401(a), (b). But instead of trying the case on January 26, 2021, the trial court signed an order retaining the case on its docket pursuant to the Texas Supreme Court's Thirty-Third Emergency Order Regarding the COVID-19 State of Disaster, which allowed the trial court in "any [termination] case previously retained on the court's docket pursuant to [Family Code] Section 263.401(b) . . . [to] extend the dismissal [date] for an additional period not to exceed 180 days" from January 14, 2021, in order "to avoid risk to court staff, parties, attorneys, jurors, and the public." *See Thirty-Third Emergency Order Regarding the COVID-19 State of Disaster*, Misc. Docket No. 21-9004, ¶3.b(ii) (Tex. Jan. 14, 2021). The trial court thus extended the dismissal date to July 13, 2021, and set the trial for May 7, 2021. *See id.*

[4]OCOK is a private provider of community-based care that contracts with the Department to provide "foster care case management, kinship, and family reunification services" in parts of the state, including Tarrant County. *See* Tex. Dep't of Family & Protective Servs., https://content.govdelivery.com/accounts/ TXDFPS/bulletins/27e68be (last visited Oct. 12, 2021); *see also* Tex. Fam. Code Ann.

3

2019 because of concerns about the children's living environment, the home's condition, and the parents' physically abusing the children. When the children were brought into the Department's care, Matt, Dan, and Jane had significant marks and bruises all over their bodies. As a result, Mother and Father had pending criminal charges for injury to Dan and Jane. Because of the bond conditions in their criminal cases, the parents had not visited any of the children since late fall 2019.

Hodridge testified that, during the case, the parents were provided with service plans that allowed them to work services toward possible reunification with the children. Although the parents had worked services, the Department was concerned that they had not accepted responsibility for the children's injuries and were not able to meet their children's needs, which are significant. According to Hodridge, then-eight-year-old Nate and then-five-year-old Dave have "very significant delays and cognitive deficiencies," and neither boy is potty trained. The boys' foster mother—who was adoption motivated and able to meet the boys' current and future therapeutic and emotional needs—thought that the boys would never be able to be potty trained.

Hodridge also testified that the parents had primarily physically abused the three older children—Matt, Dan, and Jane—who also had engaged in "bouts of self-

§§ 264.151–.170 (describing and providing requirements for Department oversight of private community-based-care system for the State of Texas).

4

inflicted harm" and had claimed that they wanted to die.[5] All three children needed long-term counseling and care. Jane, who was 10 years old at the time of trial, had been placed in a "therapeutic foster home." She had "suffered a lot of trauma," had behavioral issues, and required "a lot of support and care." On the day of trial, she was being transported to a psychiatric hospital for treatment. Then-11-year-old Dan had been placed in a residential treatment center. Dan had "a lot of anger issues and a lot of trauma" that he was processing. The Department's plan for Jane and Dan was to eventually find adoptive placements for them.

Then-12-year-old Matt was in a long-term foster home that was not adoption motivated. But the foster home was meeting Matt's needs and ensuring that Matt received needed therapy. And although the Department's goal for Matt was adoption, Hodridge understood that Matt "feels good" in his current foster home, which could be a "long-term plan" for Matt if the Department's adoption plan did not work out.

Hodridge testified that both parents had signed affidavits relinquishing their parental rights to the children, that he believed that termination was in the children's best interest, and that the parents had made the right decision in relinquishing their parental rights. He asked the trial court to appoint the Department as the children's permanent managing conservator pending the children's adoption.

_____

[5]The Department was also concerned that the three older children had been sexually abused.

5

Hodridge confirmed that because the parents had not seen the children for months, the Department had agreed that the parents could have a one-time goodbye visit with the children over Zoom if the parents' criminal bond conditions were changed to allow it. *See generally* Tex. Fam. Code Ann. § 161.2061 ("Terms Regarding Limited Post-Termination Contact"). Hodridge further confirmed that because the parents had voluntarily relinquished their parental rights, the Department had agreed that while it was the children's permanent managing conservator, it would provide the parents with a brief monthly update on the children along with a photograph of each child. *See generally id.* Hodridge clarified that these "offers" and "agreements" were because the children had continued to say that they missed Mother and "weren't promised in lieu [sic] of a relinquishment of some kind."

Neither Mother nor Father testified or offered any evidence. Regarding Mother's relinquishment affidavit, Mother's attorney stated,

> My client has reviewed the relinquishment at various time[s] and she's understood what it meant. . . . [S]he understands that she's relinquishing as to all five children and that she's doing it voluntarily and it would be in the best interest of the children.

Father's attorney asked the court to accept Father's relinquishment and stated that she had had a lengthy discussion with Father about the relinquishment, that Father understood the affidavit's terms, that Father had signed the affidavit knowingly and voluntarily, and that Father was "not given anything or promised anything in exchange for his signature."

The children's guardian ad litem also urged the trial court to accept the parents' relinquishment affidavits and urged that termination was in the children's best interest:

The two younger children probably will not be able to function in society when they are adults. They will require full-time care for the rest of their lives. It was really a blessing that their first foster home and the foster home that they continue to be in . . . have stepped up and created a schedule and structure for these boys and have really nurtured them in a way that they have never had before, and so I'm so thankful that they are going to be in a foster home that will ultimately adopt them and provide them a home and the love and support that children truly need and deserve. The older three children in this case suffered terribly at the hands of their parents. The reports that they have talked about, the conditions of the home, the language that they were subjected to, the physical punishment and discipline and abuse that they suffered at the hands of both of their parents and their grandparents is something that no parent would ever want to see a child go through, or any adult would want a child to go through. Because of this abuse, when they are placed in a home that wants to provide them structure and discipline and love, many of the negative aspects of abuse come out. They tell them they want to die. They were unloved and feel they are worthy of love. And when you see the effects of that, based upon their hospitalizations and their need for medication and they are continuing to need therapy. The oldest child, [Matt], is in a really amazing foster home. She is not a foster mom who adopts boys, but she is a single woman who is from LA and only takes older boys aged 11 to 18, and she has done wonders with them. She's done wonders with [Matt]. He feels loved, he feels appreciated, and he knows the rules. He's doing well in school[,] and he's really found a place where he knows that he's accepted and loved. [Dan] has been in and out of foster homes, and I hope that we find a place for him that is similar that is for [Matt]. [Jane] previously had a very good foster home that she made some threats of harm to other children which required her to go someplace else. She is now in a therapeutic foster home, actually a foster home with lots of years of experience. She's only been there a couple of weeks, but based upon an outburst that occurred on Wednesday night, they thought that her medication needed to be looked at and that she needs to go to a doctor and she went to a psychiatric hospital actually this morning. I do believe that these children

7

will find a place where they are loved and nurtured[,] and I do believe that these terminations are in their best interest. I will be grateful for a relationship that they might have in the future with their parents after termination, and they do have visits when they are able to and they are available. . . . So I ask the Court to accept the parents' wishes today to grant the termination and hopeful adoption of the younger two and help in finding placement in the future.

At the trial's conclusion, the trial court found by clear and convincing evidence that termination of Mother's and Father's parental rights to the children was in the children's best interest and that the Department had established by clear and convincing evidence that each parent had executed an irrevocable affidavit of relinquishment. *See id.* § 161.001(b)(1)(K), (b)(2). Based on these findings, the trial court signed an order terminating Mother's and Father's parental rights to the children and appointing the Department as the children's permanent managing conservator. The termination order also provided that the parents could have "one good-bye visit with all of the children at the same time via Zoom, if [the parents'] criminal bond conditions are modified to allow for such a visit" and that the Department would provide the parents a brief monthly update on each child and a picture of each child via email while the Department was that child's permanent managing conservator. *See id.* § 161.2061.

Neither parent moved for a new trial or filed any other postjudgment motions. Mother and Father timely filed separate notices of appeal.

## II. Father's Appeal

Central to Father's four appellate issues is a statement made about an earlier case listed in the parents' CPS case history in the affidavit supporting the Department's live termination petition in this case: "Case was called in due to concerns that [Mother] and [Father] were leaving the children in the car[e] of [Babysitter] who watches porn in the living room and has displayed sexually deviant behavior. *[Babysitter] is diagnosed [as] mildly retarded, as is [Father].*"[6] [Emphasis added.] Although Father did not alert the trial court to this diagnosis at trial or otherwise bring it to the trial court's attention, he argues in his first three issues that the trial court erred by finding that he had executed an unrevoked or irrevocable affidavit relinquishing his parental rights because (1) the evidence was legally and factually insufficient to support that finding; (2) the trial court was not "made aware of Father's diagnosis of mental retardation" and "how that might affect his ability to execute such an affidavit on the day of trial"; and (3) the evidence "seemed to suggest that the affidavit was obtained in exchange for something else of value—specifically, updates

---

[6]We recognize that "retarded" and "retardation" are now considered pejorative terms. *See, e.g.*, *Why the R-Word is the R-Slur*, Special Olympics, https://www.specialolympics.org/stories/impact/why-the-r-word-is-the-r-slur (last visited Oct. 13, 2021). We will not use those terms to describe Father's intellectual disability unless we are quoting directly from the parties' briefs or the record. *See Hall v. Florida*, 572 U.S. 701, 704, 134 S. Ct. 1986, 1990 (2014) (using the term "intellectual disability" instead of "mental retardation" and noting the change in terminology has been approved by and is used in the Diagnostic and Statistical Manual of Mental Disorders (DSM)).

9

and photos of his children." In his fourth issue, Father complains that his appointed trial counsel was ineffective because she failed to bring Father's mild intellectual disability to the trial court's attention and failed to object to the Department's leading questions. We first address Father's three relinquishment-affidavit issues.

## A. Relinquishment

### 1. *Standard of review and applicable law*

For a trial court to terminate a parent–child relationship, the Department must prove two elements by clear and convincing evidence: (1) that the parent's actions satisfy one ground listed in Family Code Section 161.001(b)(1); and (2) that termination is in the child's best interest. *Id.* § 161.001(b); *In re E.N.C.*, 384 S.W.3d 796, 803 (Tex. 2012); *In re J.L.*, 163 S.W.3d 79, 84 (Tex. 2005). Evidence is clear and convincing if it "will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." Tex. Fam. Code Ann. § 101.007; *E.N.C.*, 384 S.W.3d at 802.

To determine whether the evidence is legally sufficient in parental-termination cases, we look at all the evidence in the light most favorable to the challenged finding to determine whether a reasonable factfinder could form a firm belief or conviction that the finding is true. *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005). Similarly, in reviewing the evidence for factual sufficiency, we determine whether, on the entire record, a factfinder could reasonably form a firm conviction or belief that the Department proved the statutory grounds for termination and that the termination of

the parent–child relationship would be in the children's best interest. Tex. Fam. Code Ann. § 161.001(b); *In re C.H.*, 89 S.W.3d 17, 28 (Tex. 2002).

Relevant here, a trial court may order termination of the parent–child relationship if the court finds by clear and convincing evidence that termination is in the child's best interest and that the parent has voluntarily executed "an unrevoked or irrevocable affidavit of relinquishment of parental rights." Tex. Fam. Code Ann. § 161.001(b)(1)(K), (b)(2); *see In re K.M.L.*, 443 S.W.3d 101, 113 (Tex. 2014) ("[I]mplicit in section [161.001(b)(1)(K)] is the requirement that the affidavit of parental rights be voluntarily executed."). An affidavit is executed voluntarily when it is executed knowingly and intelligently. *See K.M.L.*, 443 S.W.3d at 113; *see also Vela v. Marywood*, 17 S.W.3d 750, 759 (Tex. App.—Austin 2000) ("Since an affidavit of relinquishment waives rights of constitutional magnitude, it must be made voluntarily, knowingly, intelligently, and with full awareness of the legal consequences." (citation omitted)), *pet. denied*, 53 S.W.3d 684 (Tex. 2001). An involuntarily executed affidavit is a complete defense to a termination suit based on Section 161.001(b)(1)(K). *See K.M.L.*, 443 S.W.3d at 113; *see also In re C.E.*, No. 02-14-00054-CV, 2014 WL 3866159, at *5 (Tex. App.—Fort Worth Aug. 7, 2014, no pet.) (per curiam) (mem. op.).

Evidence that an affidavit of voluntary relinquishment was signed, notarized, witnessed, and executed in compliance with Family Code Section 161.103 is prima facie evidence of its validity. *In re D.R.L.M.*, 84 S.W.3d 281, 296 (Tex. App.—Fort Worth 2002, pets. denied). Once the proponent of the affidavit has met that burden,

the burden then shifts to the affidavit's opponent to establish by a preponderance of the evidence that the affidavit was executed as a result of fraud, duress, or coercion. *See id.*; *Vela*, 17 S.W.3d at 757–58; *see also* Tex. Fam. Code Ann. § 161.211(c). A direct attack on a judgment terminating parental rights based on an unrevoked affidavit of relinquishment "is limited to issues relating to fraud, duress, or coercion in the execution of the affidavit." Tex. Fam. Code Ann. § 161.211(c); *see In re M.M.*, 538 S.W.3d 540, 541 (Tex. 2017); *In re K.S.L.*, 538 S.W.3d 107, 110–12 (Tex. 2017).

### 2. *Analysis*

Here, Father admits—and we agree—that his irrevocable relinquishment affidavit complied with Section 161.103's requirements. *See generally* Tex. Fam. Code Ann. § 161.103. Such compliance is prima facie evidence of the affidavit's validity. *See In re M.S.*, No. 02-18-00379-CV, 2019 WL 1768993, at *6 (Tex. App.—Fort Worth Apr. 22, 2019, pets. denied) (mem. op.); *In re B.H.*, No. 02-15-00155-CV, 2015 WL 5893626, at *3 (Tex. App.—Fort Worth Oct. 8, 2015, no pet.) (mem. op.). The burden thus shifted to Father to prove by a preponderance of the evidence that the affidavit was executed as a result of fraud, duress, or coercion, *see D.R.L.M.*, 84 S.W.3d at 296, and he is limited to those grounds on appeal, *see* Tex. Fam. Code Ann. § 161.211(c). *See generally K.S.L.*, 538 S.W.3d at 115 (noting that Section 161.211(c)'s fraud, duress, and coercion grounds are "directed at whether the parent's waiver of parental rights was knowing and voluntary").

Coercion occurs if someone is compelled to perform an act by force or threat. *In re D.E.H.*, 301 S.W.3d 825, 828 (Tex. App.—Fort Worth 2009, pet. denied) (op. on reh'g). Duress occurs when, due to some kind of threat, a person is incapable of exercising free agency and unable to withhold consent. *Id.* at 829. Fraud may be committed through active misrepresentation or passive silence and is an act, omission, or concealment in breach of a legal duty, trust, or confidence justly imposed, when the breach causes injury to another, or the taking of an undue and unconscientious advantage. *Id.* The burden of proving such wrongdoing is on the party opposing the affidavit. *Id.* at 830.

In support of his first two issues, Father argues that he did not execute the relinquishment affidavit knowingly and intelligently because he had been diagnosed with a mild intellectual disability, a diagnosis that he asserts the Department judicially admitted by including it in the affidavit supporting its live termination petition.[7] "A judicial admission is an unequivocal assertion of fact that, once made, relieves the opposing party of its burden of proving the admitted fact and bars the admitting party from disputing that fact." *Lenoir v. U.T. Physicians*, 491 S.W.3d 68, 73 (Tex. App.—Houston [1st Dist.] 2016, pet. denied) (op. on reh'g). "A judicial admission must be a clear, deliberate, and unequivocal statement." *Horizon/CMS Healthcare Corp. v. Auld*,

---

[7]As further evidence of his disability, Father also points to his indigency affidavit, which lists Social Security Disability as his only income source.

34 S.W.3d 887, 905 (Tex. 2000) (quoting *Regency Advantage Ltd. P'ship v. Bingo Idea-Watauga, Inc.*, 936 S.W.2d 275, 278 (Tex. 1996)).

Here, Father did not bring the Department's alleged judicial admission to the trial court's attention or otherwise alert the trial court to his mild intellectual disability. He likewise did not object to the affidavit or to testimony regarding his having executed it, and his attorney asked the trial court to accept the relinquishment. As noted, Hodridge testified that both parents had signed relinquishment affidavits and that the parents had had an opportunity to discuss those affidavits with their attorneys. Father's trial counsel urged the trial court to accept Father's affidavit, stating that

> I'd ask the Court [to] accept the relinquishment of my client, [Father]. We were set to begin the trial at nine o'clock and it's now 10:15. The hour prior to this, I spent discussing the relinquishment and its effect with my client. *I believe that after our lengthy discussion, he did understand the terms of the document and the legal effects of the document.* He signed it in the presence of two witnesses and it was notarized. *Additionally, the notary . . . was also able to ask him questions to ensure that he signed it knowingly and voluntarily. . . .* He knew that we were here today to begin trial. He knew that he had that option and made the decision that he would rather sign the relinquishment and have termination based on that relinquishment alone and no other reason. [Emphases added.]

In his relinquishment affidavit, Father averred (among other things) that he had been informed of and understood his parental rights; that he understood that by naming the Department as managing conservator, he was giving up all parental rights to the children and granting them to the Department; that he "freely, voluntarily, and

14

permanently g[a]ve and relinquish[ed] to the Department all parental rights and duties"; and that he understood that the affidavit was irrevocable.

In support of his third issue, Father contends that given his diagnosis and the fact that, when he executed the relinquishment affidavit, he had not had any visitation with his children in 20 months because of his criminal case's bond conditions, he was forced to sign the affidavit by means of fraud, duress, or coercion because he signed the affidavit in exchange for the Department's promise to provide pictures and updates about the children.[8] In support of this argument, Father points to the following exchange during trial:

> [The Department:] Okay. And did the [D]epartment, because the parents have relinquished, agree to provide a brief monthly update of the children and a picture while the children are in the permanent managing conservatorship of the Department
>
> [Hodridge:] That is correct.

But Hodridge later clarified that the Department's agreement to provide the parents with post-termination contact was not conditioned on the parents' relinquishing their rights to the children:

> [The Department:] The reason why the Department is providing those pictures and information is that, while these children have suffered

---

[8]We note that in conformity with the Family Code, the parents' affidavits do not provide for conditional post-termination contact. *See* Tex. Fam. Code Ann. § 161.103(h) ("The [relinquishment] affidavit may not contain terms for limited post-termination contact between the child and the parent whose parental rights are to be relinquished as a condition of the relinquishment of parental rights.").

tremendous abuse at the hands of their parents, they have continued to say that they miss their mother?

[Hodridge:] That is correct.

Q. And that they have continued to ask about their mother especially; is that correct?

A. That is correct.

Q. And based upon those expressed items from the children, we have created a plan; is that correct?

A. That is correct.

Q. And those offers and those agreements are not based upon the fact -- they weren't promised in lieu [sic] of a relinquishment of some kind;[9] is that correct?

A. That is correct.

And when Father's trial counsel asked the court to accept Father's relinquishment affidavit, Father's counsel confirmed Hodridge's testimony: "[Father] was not given anything or promised anything in exchange for his signature."

_____

[9]Father points out that "[t]echnically speaking, [this] statement does not directly contradict [Hodridge's earlier] statement, as the definition of 'in lieu' implies a replacement, not an exchange" but acknowledges that "this could be the result of an inartful misspeak . . . as this was a leading question and not in the words of the witness." Even so, Father maintains that

> this statement meant to, and should be considered as having, directly contradicted the earlier testimony, rendering both suspect, or it does not directly contradict it and it should be taken as established that the affidavit signed just moments prior to trial was done so in exchange for a promise to provide pictures and updates.

We disagree with this assessment. From the statement's context, "in lieu" is "an inartful misspeak."

16

We thus conclude that although the Department agreed that the parents could have a goodbye visit with the children over Zoom and that the Department would provide updates to the parents while it was the children's conservator and these agreements were set out in the termination order,[10] the evidence shows that these agreements for post-termination contact were not conditioned on the parents' relinquishment. And to the extent that Father is claiming that he felt pressured, was emotionally upset, or was under stress when signing the affidavit, these feelings and emotions do not rise to the level of duress or coercion. *See, e.g., M.S.*, 2019 WL 1768993, at *8 (citing cases).

In conclusion, assuming that the Department's statement regarding Father's diagnosis is a judicial admission that Father had been diagnosed as mildly intellectually disabled, Father did not bring the admission to the trial court's attention or otherwise alert the trial court that he may have lacked the capacity to knowingly and intelligently sign the affidavit. Moreover, Father presented no evidence regarding the nature and extent of his disability or its effect (if any) on his capacity to knowingly and intelligently execute a relinquishment affidavit. Considering Father's counsel's statements,[11] Hodridge's testimony, and the relinquishment affidavit itself, Father has

---

[10]The Family Code permits a trial court to provide for limited post-termination contact in cases in which the parent has signed a voluntary relinquishment affidavit. *See id.* § 161.2061.

[11]Although Father's counsel's unsworn statements in support of the relinquishment affidavit "do not constitute evidence in the formal sense," the trial

17

failed to show on this record that his relinquishment resulted from fraud, duress, or coercion, and thus the evidence was sufficient to allow the trial court to form a firm belief or conviction that Father's affidavit was voluntary.[12] *See B.H.,* 2015 WL 5893626, at *5. We overrule Father's first three issues.

## B. Ineffective Assistance of Counsel

In his fourth issue, Father complains that his appointed trial counsel was ineffective because she failed to bring Father's "mental retardation" to the trial court's attention and failed to object to leading questions.

### 1. *Applicable law*

Parents have the right to effective assistance of counsel in termination cases. *In re J.O.A.,* 283 S.W.3d 336, 341, 343 (Tex. 2009); *In re M.S.,* 115 S.W.3d 534, 544 (Tex. 2003). We review ineffective-assistance claims under the *Strickland* standard. *J.O.A.,* 283 S.W.3d at 343; *M.S.,* 115 S.W.3d at 549; *see Strickland v. Washington,* 466 U.S. 668, 687, 104 S. Ct. 2052, 2064 (1984). To establish ineffective assistance

---

court was entitled to rely on counsel's representations regarding Father's execution of the relinquishment affidavit given the ethical canons' requirement of candor to the court. *In re D.J.L.,* No. 14-16-00342-CV, 2016 WL 6108341, at *5 (Tex. App.— Houston [14th Dist.] Oct. 18, 2016, no pet.) (mem. op.); *see United States Gov't v. Marks,* 949 S.W.2d 320, 326–27 (Tex. 1997).

[12]Because we conclude that the evidence was sufficient to support termination based on Father's relinquishment affidavit, we do not address the Department's argument that Father is estopped from challenging the sufficiency of the evidence supporting termination under the invited-error doctrine. *See D.J.L.,* 2016 WL 6108341, at *3; *D.R.L.M.,* 84 S.W.3d at 295.

18

under *Strickland*, Father must show both (1) that his trial counsel's performance was deficient and (2) that his trial counsel's deficient performance prejudiced his case. *See M.S.*, 115 S.W.3d at 545 ("Under *Strickland*, the defendant, to establish an ineffective assistance claim, must successfully show both prongs of the inquiry.").

With respect to whether counsel's performance in a particular case is deficient, we must consider all the circumstances surrounding the case and must primarily focus on whether counsel performed in a "reasonably effective" manner. *Id.* at 545. In this process, we must give great deference to counsel's performance, indulging a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance, including the possibility that counsel's actions are strategic. *Id.* It is only when the conduct was so outrageous that no competent attorney would have engaged in it that the challenged conduct will constitute ineffective assistance. *Id.*

Likewise, even if the parent can show that his trial counsel's performance was deficient, he must still show that the deficient performance caused harm—that is, a reasonable probability exists that, but for counsel's unprofessional error or errors, the proceeding's result would have been different. *Id.* at 549–50. Put differently, the parent must show that counsel's errors were so serious as to deprive him of a fair trial, defined as a trial whose result is reliable. *In re H.R.M.*, 209 S.W.3d 105, 111 (Tex. 2006).

An ineffective-assistance-of-counsel allegation in a termination proceeding must be firmly founded in the record, and the record must affirmatively demonstrate

19

the alleged ineffectiveness and the resulting harm. *In re L.G.R.*, 498 S.W.3d 195, 209 (Tex. App.—Houston [14th Dist.] 2016, pet. denied). "We may not speculate to find trial counsel ineffective when the record is silent regarding counsel's reasons for h[er] actions." *In re F.L.H. IV*, No. 04-17-00425-CV, 2017 WL 6597829, at *15 (Tex. App.—San Antonio Dec. 27, 2017, pet. denied) (mem. op.) (quoting *Walker v. Tex. Dep't of Fam. & Protective Servs.*, 312 S.W.3d 608, 623 (Tex. App.—Houston [1st Dist.] 2009, pet. denied)).

### 2. *Analysis*

Father complains that his trial counsel failed to alert the trial court to his mild intellectual disability and that his trial counsel should have objected to the Department's "carefully phrased, leading questions." Again, in determining whether Father's counsel was "reasonably effective," we afford great deference to counsel's performance, indulging "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *M.S.*, 115 S.W.3d at 545 (quoting *Strickland*, 466 U.S. at 689, 104 S. Ct. at 2065). Here, Father's counsel asked the trial court to accept Father's relinquishment affidavit and stated that she had discussed it with Father and believed that after their lengthy discussion, he understood the affidavit's terms and its legal effects. In the absence of any evidence regarding the exact nature and extent of Father's mild intellectual disability, we indulge a

20

presumption that counsel's representation of Father leading up to trial[13] and her discussion with him immediately before trial included a determination that Father's mild intellectual disability did not affect his capacity to sign a relinquishment affidavit. And given that Father was asking the trial court to accept the relinquishment of his parental rights, it made strategic sense for his attorney not to object to the Department's questions. *See id.* On this record, we cannot say that trial counsel's conduct was so outrageous that no competent attorney would have engaged in it. *See id.*

Because Father has failed to satisfy the first *Strickland* prong (deficient performance), we need not consider the second prong (prejudice). *See Strickland,* 466 U.S. at 697, 104 S. Ct. at 2069. Accordingly, we overrule Father's fourth and final issue.

### III. Mother's Appeal

Mother's appointed appellate counsel has filed a brief asserting that Mother's appeal is frivolous. *See Anders v. California,* 386 U.S. 738, 744–45, 87 S. Ct. 1396, 1400 (1967); *see also In re K.M.,* 98 S.W.3d 774, 776–77 (Tex. App.—Fort Worth 2003, order) (holding that *Anders* procedures apply in parental-rights-termination cases), *disp. on merits,* No. 2-01-349-CV, 2003 WL 2006583, at *2–3 (Tex. App.—Fort Worth May

---

[13]By the time of trial, Father's trial counsel had represented Father for over a year. The trial court appointed Father's trial counsel as substitute counsel after it was discovered that Father's original appointed counsel had a legal or ethical conflict that left her "unable to handle th[e] case."

1, 2003, no pet.) (per curiam) (mem. op.). The brief meets *Anders*'s requirements by presenting a professional evaluation of the record and demonstrating why there are no arguable grounds to be advanced on appeal. Mother's counsel provided Mother with a copy of the *Anders* brief and informed her of her right to request the record and to file a pro se response. We also informed Mother of those rights. At Mother's request, we provided her with a copy of the appellate record, and she has filed a response and a supplemental response. The Department has declined to file a response.

In assessing the correctness of a compliant *Anders* brief's conclusion that an appeal from a judgment terminating parental rights is frivolous, we must independently examine the appellate record to determine if any arguable grounds for appeal exist. *In re C.J.*, No. 02-18-00219-CV, 2018 WL 4496240, at *1 (Tex. App.—Fort Worth Sept. 20, 2018, no pet.) (mem. op.); *see also Stafford v. State*, 813 S.W.2d 503, 511 (Tex. Crim. App. 1991); *Mays v. State*, 904 S.W.2d 920, 922–23 (Tex. App.—Fort Worth 1995, no pet.). We also consider the *Anders* brief itself and any pro se response. *In re K.M.*, No. 02-18-00073-CV, 2018 WL 3288591, at *10 (Tex. App.—Fort Worth July 5, 2018, pet. denied) (mem. op.); *see In re Schulman*, 252 S.W.3d 403, 408–09 (Tex. Crim. App. 2008) (orig. proceeding).

We have carefully reviewed counsel's brief, the appellate record, and Mother's responses. Finding no reversible error, we agree with counsel that Mother's appeal is without merit. *See Bledsoe v. State*, 178 S.W.3d 824, 827 (Tex. Crim. App. 2005); *In re*

*D.D.*, 279 S.W.3d 849, 850 (Tex. App.—Dallas 2009, pet. denied). We will thus affirm the trial court's order terminating Mother's parental rights to the children.

Mother's counsel did not file a motion to withdraw, and the record does not show good cause for withdrawal independent from counsel's conclusion that the appeal is frivolous. *See In re P.M.*, 520 S.W.3d 24, 27–28 (Tex. 2016) (order); *In re C.J.*, 501 S.W.3d 254, 255 (Tex. App.—Fort Worth 2016, pets. denied). Accordingly, Mother's counsel remains appointed in this appeal through proceedings in the supreme court[14] unless otherwise relieved from his duties for good cause in accordance with Family Code Section 107.016(2)(C). *See P.M.*, 520 S.W.3d at 27–28; *see also* Tex. Fam. Code Ann. § 107.016(2)(C).

## IV. Conclusion

Having overruled Father's four issues and having determined that Mother's appeal is without merit, we affirm the trial court's termination order.

/s/ Elizabeth Kerr
Elizabeth Kerr
Justice

Delivered: October 21, 2021

---

[14]Mother's counsel noted in his brief that he would move to withdraw as appellate counsel in the supreme court.

23